**Robin HAFT TRUST et al.,**
**Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 74–1302.**

United States Court of Appeals,
First Circuit.

Argued Dec. 2, 1974.

Decided Jan. 31, 1975.

Lewis H. Weinstein, Boston, Mass., with whom Norman H. Wolfe, Washington, D. C., Louis P. Georgantas, and Foley, Hoag & Eliot, Boston, Mass., were on brief for petitioners-appellants.

Carolyn R. Just, Atty., Tax Div., Dept. of Justice, with whom Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Leonard J. Henzke, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for respondent-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

In their federal income tax returns for the year 1967 the taxpayer trusts reported gains from the redemption of certain stock they owned as long-term capital gains. The Commissioner determined that the gains were ordinary income and asserted deficiencies of $17,-445.49 for each trust. The Tax Court found for the Commissioner and the taxpayers appeal. The issue before us is the relevance, after United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25

L.Ed.2d 323 (1970), of family hostility in mitigation of the constructive ownership rules of Code section 318 in determining dividend equivalence under section 302(b)(1).[1]

On October 28, 1956, Marcia Foster married Burt Haft. Two children were born of this marriage, and Burt Haft adopted his wife's two children by her deceased previous husband. After the marriage Marcia's father, Joseph C. Foster, loaned $200,000 to the Haft-Gaines Company, of which Burt Haft was an officer and stockholder, and purchased 100,000 shares of the company's common stock. In January of 1962 he created the four identical taxpayer trusts, one for each grandchild, and transferred 25,000 shares of Haft-Gaines stock to each without consideration.

In November 1966 Marcia Haft commenced divorce proceedings against Burt Haft, and each made serious and bitter charges and countercharges against the other. To separate the parties' financial interests and to provide for their future relationship, there were negotiations in which both were represented by lawyers or accountants, and Joseph Foster, Burt Haft, and Burt's brother-in-law Jack Gaines also participated at times. Disputes characterized the discussions that led to the property settlement between Mr. and Mrs. Haft. When Mrs. Haft initiated the divorce, Burt Haft moved his residence from the house they had been occupying in Bay Harbor, Miami Beach, Florida, and had no contact with the children until six or seven months later, although he had obtained extensive visitation rights and was still residing in Florida during this period. Sometime after her divorce and before 1970, Marcia Haft remarried. Thereafter, she and her new husband moved to New York, taking the children with them. After the divorce was granted on June 26, 1967, Burt Haft was indifferent to the children; he did not see them at all from the time of the divorce until 1971. After 1971 they visited him in Florida; he saw them at Christmas of 1972. After November 1966 he did not pay support for the children until a court decree ordered him to do so, and he ceased paying support entirely in the middle of 1970, although his income during the period was quite high.

While the divorce proceedings were taking place, Mr. Foster and the trusts terminated their financial involvement in the corporation. There were negotiations concerning retirement of the debt owed by the corporation to Mr. Foster, and it was finally paid in March 1967. There were also negotiations respecting the termination of the trusts' stock interests. The corporation originally offered $183,000 for all the trusts' shares, but in a subsequent meeting the offer was raised. On June 17, 1967, it was agreed that the trusts' shares would be redeemed for $250,000 plus 6 percent interest, if the corporation chose to pay the purchase price in installments over a period of years, and $200,000 plus 6 percent interest, if the entire purchase price was paid on or before February 1, 1968.

1. Taxpayers also contend that they "substantially complied" with the requirements of one of the safe harbor rules, § 302(b)(3), providing nondividend treatment for redemptions completely terminating the shareholder's interest in the corporation. Under subsection (c)(2) of that section, the attribution rules of § 318(a) are waived provided the shareholder files an agreement promising to notify the Commissioner of the acquisition of any interest in the corporation within ten years of the redemption. Taxpayers made this contention to the court below without having filed such agreements, and the court found that this was not substantial compliance. After the decision had been rendered and the judgment entered, taxpayers filed the necessary agreements and moved for vacation or reconsideration. The court did not abuse its discretion in denying these motions. Traum v. Commissioner, 237 F.2d 277, 281 (7th Cir. 1956). Whether these late filings could represent substantial compliance with the statute presented questions of fact and law not fully raised or litigated before the court at trial. Supplemental Opinion 62 T.C. 145 (1974). Since taxpayers could properly have put this point in issue by the simple expedient of filing the agreements before trial, they cannot be heard to raise it now. Cf. Second Carey Trust, 41 B.T.A. 800, aff'd, 75 U.S.App.D.C. 263, 126 F.2d 526 (1942). The redemption's failure to qualify under (b)(3) is irrelevant to its treatment under (b)(1). See § 302(b)(5).

The corporation agreed that while this obligation was outstanding, it would not pay dividends, would not pay compensation in excess of $200,000 to its shareholder-employees, would not recapitalize, and would not dispose of most or all of its assets. The corporation elected to complete payment for the stock in 1967.

Immediately before the redemption of the stock on June 17, 1967, the stock of the corporation was owned as follows:

|  | Shares |
| --- | --- |
| Burt Haft | 100,000 |
| Richard Haft (Burt's brother) | 100,000 |
| Jack Gaines | 100,000 |
| Abraham Haft Trust for the benefit of Burt Haft, Richard Haft, and Norma Gaines (Burt's sister) | 100,000 |
| Robin Haft Trust | 25,000 |
| Wendy Laura Haft Trust | 25,000 |
| Lisa Ann Haft Trust | 25,000 |
| Daniel Foster Haft Trust | 25,000 |
| Total | 500,000 |

After the redemption of the stock of the last four trusts listed above, only 400,000 shares of the stock of the corporation were outstanding.

■ In form a redemption is a sale of stock like any other sale of stock and would as such be entitled to capital gains treatment like other such sales. However, redemption could be used as a device to bail out dividends at capital gains rates if a corporation could redeem its shares proportionately and thus pay cash to the shareholders just as a dividend would without the shift in control that characterizes true sale transactions. Moreover, even a redemption disproportionate on its face may not in reality result in any shift in control if the shareholders comprise an economic unit like a family, in which the usual community of interest makes insignificant the precise location of title to shares. The Code handles these problems by treating redemptions as sales only if they meet one of the tests of section 302(b), subsection (1) of which provides for such treatment provided the distribution is "not essentially equivalent to a dividend." Dividend equivalence under this test results whenever the practical result of the transaction is to distribute accumulated earnings essentially pro rata while leaving ownership basically unchanged. Bradbury v. Commissioner, 298 F.2d 111, 115–116 (1st Cir. 1962). Section 302(c)(1) calls for the application under these tests of the complex rules of section 318 attributing constructive ownership between family members and between entities and their beneficiaries.

■ Although the taxpayers here were divested of all their shares in the Haft-Gaines Company, the redemption actually resulted in a slight increase in their proportional interests under the attribution rules from 31⅔% to 33⅓%, indicating no significant shift in control under the principle of Bradbury, supra.[2] However, in Estate of Squier v. Commissioner, 35 T.C. 950 (1961), the Tax Court embraced the principle that family discord could belie the community-of-interest rationale of the attribution rules and was thus a relevant circumstance in determining dividend equivalency under (b)(1):

> "Even after applying the attribution rules . . . the record herein reveals a sharp cleavage between the ex-

---

2. The following analysis, drawn substantially from the government's brief, indicates how this result is reached. Before the redemption, each taxpayer trust owned 25,000 shares or 5 percent of the 500,000 outstanding shares of Haft-Gaines Company stock. Under § 318(a)(2)(B)(i), the stock owned by the trust of which Burt Haft was the beneficiary is attributed to him to the extent of his ⅓ interest therein. Under § 318(a)(1)(A), an individual is deemed to own the stock owned by his parents. Thus each of the four Haft children who were beneficiaries under the four trusts were deemed to own the 20 percent of the stock owned directly by Burt Haft, plus the 6⅔ percent interest of Burt Haft in the trust of which he was a beneficiary. Before the redemption, each taxpayer thus owned a total of 31⅔ percent, after applying the attribution rules. After the redemption only 400,000 shares remained outstanding, and Burt Haft's interest accordingly increased to 25 percent from his directly owned stock. His stock ownership in the trust of which he was a beneficiary became 8⅓ percent, totaling 33⅓ percent, which, under the attribution rules, was attributed to each of the taxpayers, although they no longer actually owned any stock.

ecutor and members of the Squier family, and in spite of the attribution rules as to stock 'ownership' the redemptions herein in fact resulted in a crucial reduction of the estate's control. Accordingly, notwithstanding the attribution rules, the redemptions in this case did result in a substantial dislocation of relative stockholding in the corporation and also in fact brought about a significant change in control." 35 T.C. at 956–957.

We endorsed this principle in dictum the following year in Bradbury v. Commissioner, *supra*.[3] Taxpayers argued its applicability in the present case, but the court below took the view that *Squier* was overruled sub silentio by the Supreme Court's decision in United States v. Davis, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). *Davis* involved no claim of family hostility. Nevertheless, although he has not withdrawn his acquiescence in *Squier*, the Commissioner argues against the leading scholarly commentators[4] that *Davis'* interpretation of § 302(b)(1) necessarily establishes the irrelevance of family discord. We do not so read that case. In *Davis*, taxpayer owned 25 percent of the common stock of the redeeming corporation, and his wife, son, and daughter owned the remaining 75 percent which was attributed to him under section 318. Taxpayer also owned all the outstanding preferred, which he had purchased soon after the corporation was organized in 1945 so that it could meet the capitalization prerequisites for a Reconstruction Finance Corporation loan. It was understood that the corporation would redeem

the preferred stock when the loan was repaid. In 1963 the corporation redeemed its preferred in accordance with this understanding, and taxpayer treated his gain as not essentially equivalent to a dividend under § 302(b)(1). The Commissioner maintained that taxpayer was to be regarded as the sole shareholder because of the attribution rules, and that all distributions to such a shareholder were proportional, hence dividends, regardless of any legitimate business purpose.

In arguing before the Supreme Court taxpayer sought to avoid this result by contending on the basis of minor discrepancies in wording among the subsections of section 302(b) that the attribution principle was irrelevant in the application of the "not essentially equivalent to a dividend" test of § 302(b)(1). The Court gave this argument short shrift. But in holding that the attribution rules must be "taken into account" under section 302(b)(1), citing our *Bradbury* decision for this proposition, 397 U.S. at 306–307, 90 S.Ct. 1041, the Court did not require that the inquiry end there. The Commissioner's own regulations, § 1.302–2(b), which have not been amended in this respect since *Davis*, provide that the application of section 302(b)(1) "depends upon the facts and circumstances of each case. One of the facts to be considered in making this determination is . . . constructive stock ownership . . . under section 318(a)" (emphasis supplied). And in fact the court in *Squier* did apply the rules though it concluded on balance that the redemption before it was not essentially equivalent to a divi-

3. "While these attribution rules are generally applicable to § 302(b)(1) . . . their imposition is not inflexible and if it can be demonstrated that discord exists in a family relationship which would make attribution unwarranted, they will not be applied." 298 F.2d at 116–117 n. 7 (citing *Squier*).

4. Bittker and Eustice, described by the Supreme Court in *Davis* as "the leading commentators," 397 U.S. at 306, 90 S.Ct. 1041, and cited twice in that opinion, declare "the *Davis* decision . . . weakens, but does not eliminate, the 'family fight' argument in mitigation of § 318 attribution under § 302(b)(1)," Federal Income Taxation of Cor-

porations and Shareholders, § 9.24 at 26 n. 43 (3d ed. 1971). Comment, Defining Dividend Equivalency Under Section 302(b)(1), 16 Vill. L.Rev. 88, 105 (1970) states ". . . it is believed that the test of a meaningful reduction should be applied in the same manner as it was applied in the *Squier* and *Parker* cases. . . ." Both D. Kahn, Basic Corporate Taxation 32–33 n. 80 (1973) and Swennes, "Not Essentially Equivalent to a Dividend" Exception Still Viable Despite Davis, 41 J.Tax. 78, 82 (1974) declare that family hostility "might" serve as a mitigating factor after *Davis*. But see 23 U.Fla.L.Rev. 188, 192 n. 38 (1970).

dend. Taxpayers here argue not that the rules are inapplicable, but that they are not in themselves *determinative*.

■■ The Court's rejection of Davis' further argument that the redemption of his shares was motivated by a legitimate business purpose, hence entitled to sale treatment, does not imply a rejection of all mitigating factors in the application of section 302(b)(1). In fact the Court's thorough review of that provision's legislative history suggests the contrary. The "essentially equivalent" test was for many years the sole criterion for establishing the tax treatment of corporate redemptions. In an effort to eliminate the confusion occasioned by this indefinite provision and facilitate tax planning, the drafters of the 1954 Code replaced it with objective tests, the "safe harbor" rules which now appear as sections 302(b)(2) and (3). But the Senate considered the elimination of the "essentially equivalent" test "unnecessarily restrictive," S.Rep.No.1622, 83d Cong., 2d Sess. 44, U.S.Code Cong. & Admin.News, 1954, p. 4629, and it was reenacted along with the "safe harbor" rules. The Senate Committee stated that in the future the inquiry would be "devoted solely to the question whether the transaction by its nature may properly be characterized as a sale . . .." *Id.* at 234, U.S. Code Cong. & Admin.News, 1954, p. 4870. Focusing on this language, the Court held in *Davis* that a redemption was not entitled to preferred treatment absent a "change in the relative economic interests or rights of the stockholders." 397 U.S. at 313, 90 S.Ct. at 1048. The effect of the transaction rather than its motivation is determinative. Section 302(b)(1) requires a "*meaningful reduction* of the shareholder's proportionate interest in the corporation," *id.* (emphasis supplied). This language certainly seems to permit, if it does not mandate, an examination of the facts and circumstances to determine the effect of the transaction transcending a mere mechanical application of the attribution rules.

The Commissioner urges apart from *Davis* that the *Squier* approach is ill-conceived because the hostility inquiry leads the courts into the uncertain shifting quagmires of family relationships. The rarity with which the *Squier* rationale was invoked before *Davis* suggests that this will not prove an insurmountable problem and of course the courts are entitled to view such claims of hostility with jaundiced eyes. At any rate, though a wooden subjugation to the attribution rules might have administrative advantages it could also work injustice in particular cases, and we think that in retaining this section in the Code alongside the safe harbor rules, Congress showed itself willing to tolerate some administrative inconvenience for the sake of taxpayer equity. We are not prepared to hold that *Squier* was wrong when decided.

■ Since the court below made no findings on the hostility question, we remand to the Tax Court to reconsider taxpayers' claims in the light of the facts and circumstances of the case, including the existence of family discord tending to negate the presumption that taxpayers would exert continuing control over the corporation despite the redemption. We intimate no opinion as to the validity of these claims.

Vacated and remanded for proceedings consistent with this opinion.