David METZGER TRUST, et al., Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 81–4324.

United States Court of Appeals, Fifth Circuit.

Dec. 13, 1982.

Rehearing and Rehearing En Banc Denied Jan. 26, 1983.

§ 302(b)(1); (2) whether a trust may waive the attribution rules of § 318(a) by filing a waiver agreement pursuant to § 302(c)(2)(A)(iii); (3) whether the attribution rules of § 267(c) must be applied to interest payments between family members in discord. Governed by the plain language of the Code, a goal of a coherent tax policy, and the relevant Supreme Court precedents, 76 T.C. 42. We affirm the decision of the Tax Court.

Herbert S. Kendrick, Don C. Stephenson, Donald L. Stuart, Dallas, Tex., for petitioners-appellants.

Whitfield J. Collins, William D. Ratliff, III, Fort Worth, Tex., amicus curiae for Mid-Continent Supply Co.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Ch. App. Sec., Jonathan S. Cohen, Farley P. Katz, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before THORNBERRY, JOHNSON and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

We decide today a story driven by tensions as old as Genesis but told in the modern lexicon of the tax law. It is the story of David who built a business and left it in the charge of his eldest son Jacob to be shared with Jacob's two sisters Catherine and Cecelia, of their alienation and resulting quarrel with the tax collectors. In reviewing this decision of the Tax Court we are asked to determine the tax consequences of a reallocation of ownership of this family-owned business operated as a closely held corporation. In doing so we face three questions: (1) whether the attribution rules of I.R.C. § 318(a) must be applied despite family discord in determining whether a redemption meets the "not essentially equivalent to a dividend test" of

## FACTS

The relevant facts are not in dispute and have been agreed to in a stipulation of record. Appellant David Metzger Trust was created by David Metzger in 1942 to benefit his wife as life income beneficiary and his three children, Jacob, Catherine, and Cecelia, as one-third remaindermen each. Jacob, the eldest son, was named trustee of the Trust. Four years later, David incorporated the family business as Metzger Dairies, Inc., the other appellant. The Trust became a shareholder of Metzger Dairies.

On David's death in 1953 Jacob Metzger assumed control of Metzger Dairies. Catherine and Cecelia were directors. In the years following the father's death the sibling quarrel grew in intensity. By the 1960's, open animosity developed among Jacob, Catherine, and Cecelia. Whatever the source of their alienation, a downturn in the success of the dairy only exacerbated the problem. Catherine and Cecelia became angry when the corporation stopped paying dividends. Catherine resented what she considered to be Jacob's interference in the management of Metzger Dairy of San Antonio, a corporation of which her son was president but whose stock was owned for the most part by the same parties who owned the stock of Metzger Dairies. Cecelia was annoyed at both Jacob and Catherine because both corporations failed to pay dividends. The argument among Jacob, Catherine, and Cecelia over these and other issues unrelated to the business of the corporations continued until 1972, when the acrimony reached the point that Jacob,

Catherine, and Cecelia concluded it was necessary to terminate their joint ownership of the corporations.

After lengthy negotiations all agreed that Jacob and his family would own Metzger Dairies, Catherine and her family would own Metzger Dairy of San Antonio, and Cecelia and her family would be cashed out. The plan was for Metzger Dairies to redeem all shares owned by Catherine, Cecelia, the trusts for Catherine and Cecelia, and the David Metzger Trust. It was necessary to include the David Metzger Trust in the redemption because Catherine and Cecelia were due to receive one-third of the Trust corpus on the death of David Metzger's widow.

Immediately before the redemption, the stock of Metzger Dairies was held as follows:

| Stockholder | Shares |
| --- | --- |
| David Metzger Trust | 420 |
| Nora Metzger (David Metzger's widow) | 420 |
| Jacob Metzger | 600 |
| Trust for Jacob Metzger | 120 |
| Catherine | 600 |
| Trust for Catherine | 120 |
| Cecelia | 600 |
| Trust for Cecelia | 120 |

The redemption occurred on January 22, 1973, leaving Metzger Dairies' stock as follows:

| Stockholder | Shares |
| --- | --- |
| Jacob Metzger | 600 |
| Trust for Jacob Metzger | 120 |
| Trust for David Metzger, II (son of Jacob) | 294 |
| Trusts for Nan Metzger (daughter of Jacob) | 207 |

The Commissioner concedes that the principal motivation for the redemption was not to receive undistributed earnings,[1] but to end a business relationship that was characterized by hatred and discord among Jacob, Catherine, and Cecelia. On February 10, 1976, Jacob, as trustee of the David Metzger Trust, delivered to the IRS a waiver agreement, executed pursuant to 26 C.F.R. § 1.302–4 and purporting to waive any future interest the trust might have in the corporation.

The deferred obligation of Metzger Dairies to pay for Cecelia's 600 shares was evidenced by a promissory note executed by the corporation and payable to Cecelia in three annual installments of principal, plus interest, beginning January 22, 1974. Interest payments were actually made on January 21, 1974, January 7, 1975, and January 5, 1976. As a cash basis taxpayer, Cecelia reported interest income in 1974, 1975 and 1976, the respective years of receipt. Metzger Dairies was an accrual basis taxpayer and claimed deductions in the fiscal years ending September 30, 1973, September 30, 1974, and September 30, 1975, for the liability for interest as it accrued.

In May 1977 the Commissioner of Internal Revenue assessed deficiencies against the David Metzger Trust for the calendar year 1973 and against Metzger Dairies for the fiscal years ending September 30, 1973, and September 30, 1974.[2] On August 17, 1977, Metzger Dairies and the Trust petitioned the Tax Court for a redetermination of these deficiencies. Later the Commissioner assessed deficiencies against Metzger Dairies for fiscal year 1975 as well.[3] Metzger Dairies filed a second petition for redetermination with the Tax Court. All of the cases were consolidated for trial. The Tax Court upheld the deficiencies. After an

---

1. As of the time of redemption, Metzger Dairies had accumulated earnings of $1,815,060.77.

2. The Commissioner assessed a deficiency of $292,977.47 against the Trust on the grounds that the $585,303.25 it received in redemption of the Metzger Dairies stock should have been reported as dividend income. The Commissioner assessed deficiencies against Metzger Dairies of $2,106.86 (FY 1973) and $24,856.38 (FY 1974) mainly after disallowing interest deductions of $32,167.28 (FY 1973) and $31,- 533.07 (FY 1974) for interest accrued but not paid to Cecelia until more than 2½ months after the close of the fiscal year.

3. The Commissioner disallowed $13,926.46 of the interest deduction claimed by Metzger Dairies for FY 1975 that represented interest accrued but not actually paid to Cecelia until more than 2½ months after the close of the fiscal year. On this basis a deficiency of $6,684.68 was assessed.

agreed computation had been filed, it entered the judgment[4] here appealed from.

## THE TRUST'S APPEAL

### (a) *The Statutory Framework*

While ordinary income treatment for dividends and capital gains treatment for sales of stock are primer categories of the Internal Revenue Code, their line of separation with stock redemptions is less than bright. Stock redemptions may resemble both sales of stock and dividends, since they involve corporate payment to a shareholder for stock but may also distribute corporate earnings. The desire for tax advantage insures recurring disputes over when a stock redemption is a dividend and when it is a purchase of stock. Given the inherent economic incentives of stock redemptions in myriad form mirroring the variety of their commercial objectives and often constructed by lawyers trained in an adversarial tradition, a workable decision mechanism must be capable of looking through innovative form to the economic reality beneath. It is not surprising then that the categorization process is heavily indexed by actual changes in corporate ownership. That is, when a redemption significantly reduces a stockholder's voting interest in a corporation, it resembles a sale of stock more than a dividend and is to be accorded capital gains treatment. On the other hand, if the redemption is basically a pro rata distribution, it is treated as a dividend.[5] This principle, whose application may also be termed a wary search for reality, is overlaid by the circumstance that here the tax code presents in an acute fashion the constant judicial tension of the competing demands of predictability and case specific equity.

Despite their generality these principles form the regression line for case reconciliation, and as we will see they provide an aid to the identification of the judicial outliers.

Our specific analysis is channelled by the Code's structure: payments to shareholders from accumulated earnings will be treated as dividends unless the payment can be brought under an exception. That is, the controlling premise is that distributions by corporations to stockholders out of the taxable year's earnings or out of accumulated earnings are to be treated as dividends. I.R.C. § 316(a). Section 302 provides the exceptions. If the redemption is "not essentially equivalent to a dividend," § 302(b)(1), a "substantially disproportionate redemption of stock," § 302(b)(2), or a "termination of [the] shareholder's interest," § 302(b)(3), it will be treated as a distribution in exchange for the stock. At first glance, all three of these provisions are applicable to the Metzger transaction since the corporation purchased all the stock of Catherine, Cecelia, their trusts, and the David Metzger Trust, while at the same time made no payments to the other stockholders, namely Jacob Metzger and his trust. Yet the attribution rules of the Code pose immediate problems.

### Attribution

If a father sells some of his shares back to a corporation, yet after the transaction he and his ten year old son end up owning the same combined percentage of voting shares, the transaction cast as a stock purchase might be an extraction of corporate earnings in nondividend form. The Code responds to this risk, with fixed attribution rules. An individual is considered to own

---

**4.** The Tax Court found deficiencies of $187,-037.80 on the part of the Trust for taxable year 1973; $21,677.55 on the part of Metzger Dairies for taxable (i.e., fiscal) year 1974, and $6,684.68 on the part of Metzger Dairies for taxable (i.e., fiscal) year 1975.

**5.** So, for example, if Stockholder A owns 60 of a corporation's 100 shares of common stock, Stockholder B owns the other 40 shares, and the corporation redeems 50 of A's shares, capital gains treatment is appropriate. On the oth-

er hand, if the corporation redeems only 30 of A's shares and 20 of B's, the redemption is treated as a dividend to the extent there are earnings to distribute. For some practical examples illustrating the effects of §§ 302 and 318, *see Rickey v. United States,* 592 F.2d 1251, 1256 (5th Cir.1979). *See also* Treas.Reg. § 1.302–2(b). There is a gray area—distributions that do not significantly reduce a stockholder's voting interest but are not pro rata, either.

the stock owned by his spouse, children, grandchildren, and parents. § 318(a)(1). An estate or trust is considered to own the stock owned by a beneficiary of the estate or trust. § 318(a)(3). A beneficiary is considered to own proportionately the stock owned by the estate or trust of which he is a beneficiary. § 318(a)(2). By these rules the Trust is the owner of the entire stock of Metzger Dairies both before and after the redemption.[6]

The Code provides that, with one exception, these attribution rules "shall apply in determining the ownership of stock for purposes of" § 302. § 302(c)(1). The one exception is that § 318(a)(1), the rules governing attribution of ownership from individuals to individuals, shall not apply in the case of a distribution described in § 302(b)(3), that is, a complete termination of a shareholder's interest, *if:*

1. "immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor" (§ 302(c)(2)(A)(i));

2. "the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years ..." (§ 302(c)(2)(A)(ii));

3. the distributee files an agreement (a "waiver agreement") as prescribed by Treasury regulations (§ 302(c)(2)(A)(iii)).[7]

In other words, § 302(c)(2)(A) by its terms permits an *individual* to avoid attribution of ownership if he gets out of the corporation and agrees to stay out.

The commands of §§ 302 and 318 are unambiguous. By their literal language, as an "entity" rather than an individual, the David Metzger Trust does not qualify for the sole statutory exception to the attribution rules. The Trust argues however (1) that family discord should "mitigate" against the applicability of the attribution rules, and (2) that the Trust's filing of a waiver agreement and complete termination of its *actual* interest in the corporation (even though the Trust is not an "individual") effectively waived the attribution rules. We turn to the first contention.

### (b) *A Family Discord Exception to Attribution?*

■ The Trust argues that family discord may "mitigate" the application of the attribution rules in determining dividend equivalency, especially given the undisputed fact that the purpose of the redemption was not to distribute corporate earnings. From the stipulated fact that the purpose of redemption was to bring peace to a family quarrel, the Trust launches two attacks upon the attribution rules. First, it argues that because it is undisputed here that the family cannot function as an economic unit, the attribution rules, built as they are upon that premise, are inapplicable. Second, the Trust argues that even if the Trust by virtue of attribution is virtually the sole shareholder before and after, the redemption was nonetheless not essentially equivalent to a dividend. The argument continues

---

**6.** Before redemption the Trust was the constructive owner of Nora, Jacob, Catherine, and Cecelia's shares, because they were its beneficiaries. § 318(a)(3)(B). Jacob, Catherine, and Cecelia were the constructive owners of the shares held by their individual trusts. § 318(a)(2)(B). Thus, the Trust constructively owned all of Metzger Dairies' stock.

After redemption the Trust remained constructive owner of all the stock because the shares held by the trusts for Jacob's children were attributable to the children, § 318(a)(2)(B), thence to Jacob, § 318(a)(1)(A), and finally to the Trust, § 318(a)(3)(B).

**7.** Even if these three conditions are met, the attribution rules will not be waived if the distributee acquired any of the redeemed stock within the past ten years from a person whose stock ownership is otherwise attributable to him and tax avoidance was a primary purpose of the transaction. § 302(c)(2)(B)(i). Nor will they be waived if within the past ten years a person whose stock ownership is otherwise attributable to the distributee acquired stock from the distributee and tax avoidance was a primary purpose of that transaction, unless the stock is included in the redemption. § 302(c)(2)(B)(ii). These are known as the "look back" provisions; § 302(c)(2)(A)(ii) is known as the "look forward" provision.

that this follows from the undisputed purpose of the redemption. That is, the purpose not being to bail out corporate earnings, the central base for application of nonequivalency has been touched.

As will be seen the first argument fails because it is built upon the erroneous assumption that attribution is treated by the Code as a rebuttable presumption rather than a mandated view of familial relationships. The second argument fails because it denies full sway to the decision of the Supreme Court in *United States v. Davis,* 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970). Indeed, *Davis* provides much of the answer to the first argument as well. For this reason we will address the arguments together, separating them only when necessary to context.

### Davis

In *Davis* the Court held that the attribution rules of § 318(a) must be applied before determining dividend equivalency. The Court held that regardless of a purpose other than to distribute corporate earnings the after-attribution structure was such that the redemption was in the nature of a dividend. In *Davis,* the taxpayer had purchased the preferred stock of a corporation in 1945 in order to increase the corporation's working capital so that it might qualify for an RFC loan. As originally planned, the loan was fully repaid and the corporation redeemed the taxpayer's preferred stock. By this time, however, the corporation's common stock was held entirely by the taxpayer, his wife, his son, and his daughter. The Commissioner viewed the redemption as essentially equivalent to a dividend because after application of the attribution rules the taxpayer "owned" 100% of the corporation's common stock. Any distribution to him, therefore, was a pro rata distribution to all the corporation's stockholders, or the essential equivalent of a dividend.

The Supreme Court agreed with the Commissioner's analysis. In its first step it held that the attribution rules had to be applied in determining dividend equivalency under § 302(b)(1). "[T]he attribution rules continued to be made specifically applicable to the entire section, and we believe that Congress intended that they be taken into account wherever ownership of stock was relevant." 397 U.S. at 306–307, 90 S.Ct. at 1044–1045. The taxpayer was deemed the owner of all 1000 shares of the company's common stock.

Second, the Court held that the presence or absence of a tax-avoidance motive could not be considered in determining dividend equivalency under § 302(b)(1). *Id.* at 311, 90 S.Ct. at 1047. " '[T]he business purpose of a transaction is irrelevant in determining dividend equivalence.' " *Id.* at 312, 90 S.Ct. at 1047 (quoting *Hasbrook v. United States,* 343 F.2d 811, 814 (2d Cir.1965)). The Court therefore concluded that the IRS had properly characterized the redemption of the preferred stock as essentially equivalent to a dividend, regardless of the taxpayer's (and the corporation's) business purpose back in 1945.[8]

In *Davis* the Court reasoned:

After application of the stock ownership attribution rules, this case viewed most simply involves a sole stockholder who causes part of his shares to be redeemed by the corporation. We conclude that such a redemption is always 'essentially equivalent to a dividend' within the meaning of that phrase in § 302(b)(1) . . .

*Id.* 397 U.S. at 307, 90 S.Ct. at 1045. *Davis* teaches that in applying the "essentially equivalent to a dividend" test after the attribution rules are applied, if the resulting structure has virtually the same incidents of ownership the corporate payments distribute earnings despite an indisputable contrary business purpose.

---

**8.** It is not totally clear that the attribution rules *had* to be applied in *Davis* to reach the Commissioner's result. Even if the taxpayer were not considered the owner of all the corpora-tion's common stock, redemption of his preferred did not reduce his voting interest in the corporation.

*Treas.Reg. § 1.302–2(b)*

Confronted by the Supreme Court's holding in *Davis,* the Trust argues that its position nevertheless is supported by Treas.Reg. § 1.302–2(b), language in *Davis* interpreting § 302(b)(1) as applying whenever there is a "meaningful reduction in the shareholder's proportionate interest," and the legislative history of § 302(b)(1).

Treas.Reg. § 1.302–2(b) provides:

The question whether a distribution in redemption of stock of a shareholder is not essentially equivalent to a dividend under section 302(b)(1) depends upon the facts and circumstances of each case. One of the facts to be considered in making this determination is the constructive stock ownership of such shareholder under section 318(a).

Pointing to this language the Trust argues that before and after structure is only one factor in the dividend equivalency inquiry. The argument continues that despite the circumstance that after attribution there was no shift in the incidents of control there was no dividend because indisputably the redemption was for another purpose.

Treas.Reg. § 1.302–2(b), however, contained the same language prior to the *Davis* decision. The regulation is ambiguous. It can be interpreted as the Trust would have it, namely that attribution is only a presumption. On the other hand, it can be interpreted as saying that attribution rules must be given full effect, but are not necessarily decisive on the ultimate issue of dividend equivalency.

### *"Meaningful Reduction"*

It is true, as the Trust points out, that some commentators and courts have indicated that *Davis* does not foreclose arguments for capital gains treatment based on family discord.[9] Professors Bittker and

Eustice have said, "The *Davis* decision . . . weakens, but does not eliminate, the 'family fight' argument in mitigation of § 318 attribution under § 302(b)(1) . . ." B. Bittker & J. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 9.24 n. 73 (4th ed. 1979). In *Robin Haft Trust v. Commissioner,* 510 F.2d 43 (1st Cir.1975), the First Circuit held that family discord might "negate the presumption" of the attribution rules that the taxpayer trusts exercised continuing control over the corporation after their actual holdings had been redeemed. *Id.* at 48. The trusts had been set up to benefit four children and were funded by shares of the corporation. The father of the children also owned a large percentage of the corporation's stock. While the father was going through divorce proceedings and was not even in contact with the children, the trusts' shares were redeemed as part of a program to terminate the involvement of the wife's family in the corporation. The IRS applied the attribution rules. Since the percentage of shares constructively owned by each of the trusts increased after the redemption, the IRS determined that the payment to the trusts was ordinary income. The Tax Court upheld the Commissioner. The First Circuit, however, directed the Tax Court "to reconsider taxpayers' claims in the light of the facts and circumstances of the case, including the existence of family discord tending to negate the presumption that taxpayers would exert continuing control over the corporation despite the redemption." *Id.* at 48.

For the most part, courts and commentators who urge that *Davis* leaves open the family discord question have emphasized that the *Davis* Court, despite its preference for objective tests, defined the "essentially equivalent to dividend" test in open-ended terms. "[T]o qualify for preferred treat-

---

9.   *See, e.g.,* O'Dell & Boyd, "Family Hostility and Stock Redemptions: Revenue Ruling 80–26 Revives the Controversy," 59 Taxes 153, 156–160 (1981) (criticizing a revenue ruling that requires strict application of the attribution rules in determining dividend equivalency under § 302(b)(1) despite claims of family hostility); Swennes, " 'Not Essentially Equivalent to

a Dividend' Exception Still Viable Despite *Davis,*" 41 J. Tax. 78, 82 (1974) (family discord "is one instance in which attribution rules might be waived"); Note, 16 Vill.L.Rev. 88, 105 (1970) (cases holding that family discord may enter into application of "not essentially equivalent to a dividend test" still good law after *Davis* ).

ment under [§ 302(b)(1)], a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation." 397 U.S. at 313, 90 S.Ct. at 1048. In *Robin Haft Trust,* the First Circuit concluded that "[t]his language certainly seems to permit, if it does not mandate, an examination of the facts and circumstances to determine the effect of the transaction transcending a mere mechanical application of the attribution rules." 510 F.2d at 48. Several commentators have similarly interpreted the "meaningful reduction" language.[10]

These interpretations are not persuasive. The *Davis* Court was referring to a meaningful reduction in the shareholder's interest *after* application of the attribution

10. O'Dell & Boyd, *supra* note 9 at 156; Note, *supra* note 9 at 105.

11. One commentary argues that a slight reduction in constructive ownership may be a "meaningful" reduction within the meaning of *Davis* if there is family hostility. Note, *supra* note 9 at 105. That analysis cannot be applied here because there was no reduction in the Trust's constructive ownership. In any event, we think it is a misreading of *Davis.*

12. As one commentator has noted, "On the one hand, the provisions of section 302 apply the attribution rules without mitigation. On the other hand, the 'essentially equivalent to a dividend' language of the Code and the legislative history of section 302 require a factual determination." Brogan, "The Interaction Between Family Attribution Rules and Corporate Redemptions," 31 Case W.L.Rev. 304, 313 (1981). In this commentator's view, the statute provides conflicting guidance. Therefore, he argues that family disharmony *may* mitigate application of the attribution rules. *Id.* at 313–319. We think this analysis is wrong. The two statutory provisions can easily be reconciled if one recognizes that, while the "factual determination" required by § 302(b)(1) may take many factors into account, it must accept the attribution rules as given.

We are more convinced by the following analysis:

Although the *Davis* Court did not call for a mechanical application of the attribution rules in so many words, it did observe that the rules were designed to 'provide a clear answer to what would otherwise be a difficult tax question.' This statement indicates the Court's desire to avoid having to analyze the hostility or amicability in the section 318 relationships in each case. Indeed, *Davis* rejected the use of other subjective criteria,

rules.[11] It would be strange indeed if what the Court really meant was that the attribution rules are to be applied before determining dividend equivalency, but then in the course of determining dividend equivalency their applicability could be reconsidered.[12] If that were so, the attribution rules would hardly "provide a clear answer to what would otherwise be a difficult tax question . . ." 397 U.S. at 306, 90 S.Ct. at 1044.[13]

### Legislative History of § 302(b)(1)

The Trust also points to the legislative history of §§ 302 and 318. It is not necessary to traverse a long and complicated history here. Section 302's predecessor was a single dividend equivalency test. It had

such as business purpose or tax-avoidance motives, in determining dividend equivalence under section 302(b)(1). It is doubtful that the Court would proscribe some subjective inquiries but at the same time approve ad hoc determinations of section 318's application to section 302(b)(1).

Postelwaite & Finneran, "Section 302(b)(1): The Expanding Minnow," 64 Va.L.Rev. 561, 592 (1978).

13. The Commissioner argues that *Haft Trust* is in any event distinguishable because the attribution in the present case is not across unfriendly lines. Jacob Metzger was the trustee of the David Metzger Trust; thus according to the Commissioner attribution from him and his dependents to the Trust did not raise an issue of family hostility.

We are not convinced by this argument and prefer not to rely on it. The proceeds of the redemption went not to Jacob but to his sisters. Therefore, if the attribution rules are to be applied flexibly, ownership of the shares held by the Trust should be attributed to the sisters and not to Jacob. Either a flexible application of § 318(a) is appropriate or it is not. The IRS cannot have it both ways.

It is arguable that this court approved *Haft Trust* and the family hostility exception to the attribution rules when it decided *Rickey v. United States,* 592 F.2d 1251 (5th Cir.1979). In a footnote to its opinion, this court rejected the contention that since *Davis* family hostility could no longer be a relevant circumstance in determining dividend equivalency. "We do not agree with that interpretation as *Davis* involved no claim of family hostility," the court said. *Id.* at 1257 n. 6. We are free to disregard dictum and do so here.

been interpreted flexibly, so that a redemption with a legitimate business purpose was treated as not "essentially equivalent to a dividend." In 1954 the House version of § 302 contained only the safe harbors of § 302(b)(2) ("substantially disproportionate redemption") and § 302(b)(3) ("termination of shareholder's interest"). The Senate added § 302(b)(1), the old essential equivalency test, because the House rules "appeared unnecessarily restrictive." S.Rep. No. 1622, 83d Cong., 2d Sess. 44, *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 4675. Thus, several commentators have argued that Congress meant to reinstate subjective inquiry.[14] In *Davis,* however, while conceding that "[t]he intended ·scope of § 302(b)(1) as revealed by this legislative history is certainly not free from doubt," 397 U.S. at 311, 90 S.Ct. at 1047, the Court concluded that Congress was rejecting past decisions that looked to motive. Section 302(b)(1) was not intended to be a mechanical test, but it was not intended to be a subjective test, either. Rather, Congress intended "a factual inquiry," "devoted solely to the question of whether or not the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation." S.Rep. No. 1622, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Cong. & Ad.News 4621, 4870–4871. The Senate Report adds that "the presence or absence of earnings and profits of the corporation is not material" to dividend equivalency. *Id.* at 4871. If so, motive could hardly be material since in the absence of earnings there would be no motive to seek capital gain treatment. The issue, as the *Davis* Court said, was not the taxpayer's motive but whether there was "a

meaningful reduction of the shareholder's proportionate interest in the corporation." 397 U.S. at 313, 90 S.Ct. at 1048.[15]

We return to the first level of the Trust argument—that attribution bottomed as it is on assumed family unity ought not to be applied when the assumption is contrary to stipulated fact. Nothing in the legislative history suggests that the attribution rules are to be "mitigated" in special cases. On the contrary, the Senate Report states that "the rules for constructive ownership of stock section 318(a) shall apply for purposes of this section generally." S.Rep. No. 1622, 83d Cong., 2d Sess., *reprinted in* 1954 U.S. Cong. & Ad.News 4621, 4872. Neither the language of the statute, the Supreme Court's opinion in *Davis,* nor the legislative history supports treating the attribution rules as rebuttable presumptions as the Trust is seeking.

Under the Trust's approach the Commissioner and the courts would be forced to highly case specific inquiries into elusive fact patterns. The pattern, intensity, and predicted duration of a family fight are difficult enough for the solomonic justice of our domestic relations courts. It is hardly the basis for a soundly administered tax policy. The fixity of the attribution rules then in this sense is not their weakness but their strength.

In summary, we believe that the Commissioner and Tax Court were correct in refusing to take family discord into account in applying the attribution rules.[16] When a question is raised as to the dividend equivalency of a redemption, under § 302(b)(1) the correct approach is to apply the attribution rules *first,* then to determine whether there

---

**14.** Brogan, *supra* note 12 at 312; Holden & Serling, "Section 302 Redemptions: New Principles and Prospects," 11 Cum.L.Rev. 553, 556 (1980).

**15.** One commentator has described the *Davis* test as "a yet undetermined *objective* standard." Comment, "Stock Redemption and the Test for Dividend Equivalency Under Section 302(b)(1) of the Internal Revenue Code of 1954," 23 U.Fla.L.Rev. 188, 194 (1970) (emphasis added). We think this is an accurate characterization.

**16.** The Tax Court in its opinion below did suggest that in cases of non-pro-rata distribution family hostility "can be a relevant fact to be considered in determining whether the reduction in the shareholder's interest is meaningful so as to qualify the distribution as not essentially equivalent to a dividend under section 302(b)(1)." 76 T.C. 42, 62–63 (1981). That notion is inconsistent with our approach. Regardless, such a case was not presented below or here.

has been "a meaningful reduction of the shareholder's proportionate interest," without regard to whether the interest is actually or constructively held. What is "meaningful" then, to borrow a word, is essentially an inquiry into structure, a structure that applies statutorily dictated rules of economic unity.

### (c) Waiver of Attribution by Trusts?

█ The Trust's second contention is that it executed a waiver agreement that met the requirements of § 302(c)(2)(A)(iii) and hence qualified for the statutory exception to the attribution rules. This contention presents the question whether a trust may "waive" attribution of ownership even though § 302(c)(2)(A)(iii), by its terms, permits only attribution of ownership to *individuals* to be waived.[17] Our resolution of this issue will not have a lasting effect on the law of this circuit, because section 228 of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324, has amended § 302(c)(2) prospectively so as to expressly prohibit waivers of attribution to and from entities (including trusts).[18] But it will have an impact on the Metzgers and perhaps on the tax jurisprudence of this circuit.

### Rickey

Our analysis of the waiver issue must focus upon this court's decision in *Rickey v. United States,* 592 F.2d 1251 (5th Cir.1979). There we permitted an estate that had been required to redeem stock in accordance with the company's articles of incorporation and the instructions in decedent's will to file a waiver of the attribution rules. The facts in *Rickey* were exceptional. The decedent, Horace Rickey, Sr., had owned over 57% of the corporation's stock. Most of the remaining stock was held by his children. When he died, a provision of the articles of incorporation required that his stock be redeemed by the corporation. Horace Sr.'s will also directed that the shares be tendered to the corporation. This left most of the stock after the redemption in the hands of the three children. However, those children were also the residuary legatees under Horace Sr.'s will. Therefore, with the application of the attribution rules, the estate remained the constructive owner of a controlling interest in the corporation after the redemption. The Commissioner assessed taxes at ordinary income rates. Although the estate had executed a waiver agreement, the Commissioner refused to recognize the waiver because § 302(c)(2)(A), by its terms, only permitted waiver of attribution to individuals.

Responding to what it perceived as an "inappropriately harsh result[ ]," this Court held that the estate could file a waiver of the attribution rules. 592 F.2d at 1258. While conceding that "the literal language of the statute" dictated a different result, this Court reasoned that permitting an estate to waive attribution in the circumstances of the case was "more in consonance with the intent of Congress in enacting these sections." *Id.*

*Rickey* has been heavily criticized by courts and commentators. They have pointed out that it is contrary to the language of § 302(c)(2)(A), which permits waiver only of attribution to individuals;

---

17. Section 302(c)(2) states that the attribution rules of *section 318(a)(1)* shall not apply if certain conditions are met. The attribution rules relating to trusts are contained in 318(a)(2) and 318(a)(3).

18. Section 228(a) outlines procedures by which entities may waive attribution from *individuals* to *individuals.* The conference committee report states, "Under the bill, only family attribution under section 318(a)(1) may be waived by an entity and its beneficiaries. The waiver rules would not be extended to waivers of attribution to and from entities and their beneficiar-

ies (secs. 318(a)(2) and 318(a)(3))." H.R.Rep. No. 760, 97th Cong., 2d Sess. 545 (1982). The conference committee expressly disavowed any implied comment as to the pre-TEFRA status of entity waiver: "The conferees intend that the bill should not be construed to provide any inference as to whether the *Rickey* decision [discussed *infra* ] adopts a proper construction of present law. Nor is any inference intended as to whether the other cases extending the waiver rules for family attribution to entities adopt a proper construction of present law." *Id.* at 545–546.

that it misreads the legislative history, which confirms what the statute itself says; and that it introduces undesirable uncertainty into tax planning.[19] One may also question *Rickey's* consistency with *Davis*.[20] *Rickey*, however, is the law of the Fifth Circuit, and this panel is obligated to follow it.

### Rickey and Trusts

We are not, however, obligated to extend *Rickey*. There are sufficient differences between waiver by an estate and waiver by a trust to justify different rules. An estate is in many senses a continuation of the decedent. A person can "create" only one estate, and that estate does not come into existence until the person's death. Thus, assuming Horace Rickey, Sr., could have filed a waiver agreement on his deathbed, there seems to be little difference, in tax theory, if his estate files the waiver.[21] Section 302(c)(2)(A) is designed to permit one family member to turn over control of a close corporation to another family member once and receive capital gains.[22] Allowing this to occur after the first family member's death does not vitiate the purposes of § 302(c)(2)(A).

Permitting waiver by trusts, however, would run contrary to the purposes of § 302(c)(2)(A). Trusts are completely artificial entities: A person can create any number of them. If a trust could waive attribution, there would be nothing to prevent a settlor, one of the beneficiaries, or a new trust with the same beneficiaries from reacquiring the same interest in the corporation.[23] Ownership of the stock could be shifted from trust to trust, from trust to beneficiary, or from beneficiary to trust, without any change in the family member who actually controls the corporation. The potential for abuse would be great.[24]

It is true that the parties have stipulated here to an absence of tax-avoidance motive. This, however, emphasizes the dangers of permitting waiver of attribution by a trust. To prevent a bail-out of corporate earnings,

19. *See* the Tax Court's opinion below, 76 T.C. 42, 68–72 (1981). *See also Henry Patterson Trust v. United States,* No. C80–145, slip op. at 10–14 (N.D. Ohio 1982), wherein the court held that a trust could not effectively waive the beneficiary-to-trust attribution rules.

See Comment, "Estate Waiver of the Estate-Beneficiary Attribution Rule in Nonliquidating Redemptions Under Section 302 and Related Matters: The *Rickey* Case in the Fifth Circuit," 35 Tax L.Rev. 147, 151, 154, 162–163 (1979); Note, "Stock Redemptions and the Estate Attribution Rules," 128 U.Pa.L.Rev. 650, 665–667 (1980); Karzon, "No Smooth Sailing for Fiduciaries Waiving Attribution in Stock Redemptions," 59 Taxes 3, 6 (1981). *But see* Brogan, *supra* note 12 at 326–327.

Both the House and Senate reports repeatedly refer to waiver of the *family* attribution rules. They do not mention other forms of waiver. See H.Rep. No. 1337, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad. News 4017, 4061, 4212–4213; S.Rep. No. 1622, 83d Cong., 2d Sess., *reprinted in* 1954 U.S.Code Cong. & Ad.News 4621, 4676, 4872–4873.

20. *See* Comment, *supra* note 19 at 162.

21. This is a slight oversimplification. If Horace Sr. had redeemed the stock before he died, he would have had to pay capital gains tax. When the estate redeemed the stock, the basis had been stepped up to fair market value at the time of death. I.R.C. § 1014(a).

22. The ten-year "look back" and "look forward" provisions, §§ 302(c)(2)(B) and (c)(2)(A)(ii), basically guarantee that transfer from one family member to another may only occur once a generation.

23. Commentary has focused on whether beneficiaries of a trust would be bound by a trust's waiver agreement and thus could not acquire any interest within 10 years of the date of distribution. *Rickey* itself did not deal with this issue. *See* Holden & Serling, *supra* note 14 at 568. Most commentators have concluded that the beneficiaries would not be bound. Comment, *supra* note 19 at 155–156. Moreover, a rule permitting waiver by a trust so long as the waiver was binding on the beneficiaries would not help the Trust in the present case. Jacob was one of the beneficiaries of the David Metzger Trust, yet he retains a controlling interest in Metzger Dairies.

24. It is worth noting that one commentator who is favorable to the *Rickey* decision does not believe it can be extended to trusts. "The rationale underlying the decision ... seems to limit its application to estates." Brogan, *supra* note 12 at 327. This commentator proposes a legislative change permitting statutory waiver by estates, not by trusts. *Id.* at 333–334.

the Commissioner and the courts would have to delve deeply into motive. *Davis,* however, condemns such an approach. 397 U.S. at 309, 90 S.Ct. at 1046 ("the authors of the new Code sought to provide objective tests to govern the tax consequences of stock redemptions"). Moreover, even an unblemished motive at the time of redemption is no guarantee that the parties who have bailed out will not bail back in later. A rule permitting waiver by estates is consistent with the underlying rationale of waiver and can be accommodated without an inquiry into the taxpayer's motive. A trust waiver rule, on the other hand, is inconsistent with the rationale of waiver and would require a troublesome inquiry into motive. Accordingly, we hold that as to pre-TEFRA redemptions, a trust may not file an effective waiver agreement pursuant to § 302(c)(2)(A).

Having concluded that family hostility does not mitigate the application of the attribution rules in determining dividend equivalency, and that a trust may not waive those rules, we therefore reach the conclusion that the deficiency was properly assessed against the Trust. The second issue raised by this appeal is the appropriateness of interest deductions claimed by Metzger Dairies.

## THE CORPORATION'S APPEAL

█ Section 267 of the Code disallows deductions for certain transactions between related taxpayers. The underlying philosophy of § 267(a)(2), the subsection at issue here, is that related taxpayers should not be able to generate tax deductions in a given year without corresponding income. Metzger Dairies as an accrual basis taxpayer claimed deductions for amounts that were not actually paid to Cecelia until more than 2½ months after the close of its fiscal year. Cecelia, as a cash basis taxpayer, did not report those amounts as income until the following taxable year. Therefore, if Metzger Dairies and Cecelia were related taxpayers within the meaning of § 267, Metzger Dairies was not entitled to certain interest deductions.[25]

Section 267(b) defines the relationships covered by § 267(a). These include "[a]n individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual." § 267(b)(2). Section 267(c), however, provides that "[f]or purposes of determining, in applying subsection (b), the ownership of stock . . . (2) [a]n individual shall be considered as owning the stock owned, directly or indirectly, by or for his family." Section 267(c)(4) defines the family of an individual as including his brothers and sisters. Therefore, putting § 267(b), § 267(c)(2), and § 267(c)(4) together, Cecelia and Metzger Dairies (since Jacob owned a controlling interest in the corporation after the redemption[26]) were related persons within the meaning of § 267. If the literal language of § 267 is followed, the Commissioner was correct in disallowing the deductions.

Appellant Metzger Dairies, however, argues that the attribution rules of § 267 should not apply because of family hostility. Metzger Dairies seeks an exception to § 267(c) similar to the family discord exception to § 318(a) sought by the David Metzger Trust.

Metzger Dairies cites no case in support of such an exception. In fact, Metzger Dairies cites no case in support of any nonstatutory exception to § 267. On the other

---

**25.** Section 267(a)(2) sets forth three conditions that must be met for disallowance of the interest deduction. First, the interest otherwise deductible must not have been paid within 2½ months of the close of the taxpayer's taxable year. § 267(a)(2)(A). Second, the interest must not, unless paid, be includible in the income of the recipient for the same taxable year. § 267(a)(2)(B). Third, the taxpayer and the recipient must be related persons within the meaning of subsection (b). § 267(a)(2)(C).

Metzger Dairies concedes that the first two conditions were met; the dispute is over the third.

**26.** After the redemption, Jacob's actual ownership was 600 of the 1221 outstanding shares. Thus, § 267(c) has to be applied once more (under § 267(c)(1) stock owned by a trust is deemed to be owned proportionately by its beneficiaries) to get Jacob above the 50% figure.

hand, both the Supreme Court and the Fifth Circuit have read the section in literal terms. In *McWilliams v. Commissioner,* 331 U.S. 694, 67 S.Ct. 1477, 91 L.Ed. 1750 (1947), the Supreme Court held that § 267's predecessor disallowed losses from sales of stock by a taxpayer when his wife simultaneously bought the same stock on the exchange. Although this was a transparent tax-avoidance transaction, the Court spoke generally about the role of § 267's predecessor:

> Section 24(b) states an absolute prohibition—not a presumption—against the allowance of losses on any sales between the members of certain designated groups. The one common characteristic of these groups is that their members, although distinct legal entities, generally have a near-identity of economic interests. It is a fair inference that even legally genuine intra-group transfers were not thought to result, usually, in economically genuine realizations of loss, and accordingly that Congress did not deem them to be appropriate occasions for the allowance of deductions.

*Id.* at 699, 67 S.Ct. at 1480.

We recently interpreted § 267 in *Wyly v. United States,* 662 F.2d 397 (5th Cir.1981). There we held that loss deductions were properly denied to parents who had sold stock to trusts set up to benefit their children. Under Texas law, there was a remote possibility that one (or both) of the parents would benefit under the trusts, if all four of the children died first. This possibility was held sufficient to make the parents and the independent trustee "related persons" under § 267(b)(6), which refers to "[a] fiduciary of a trust and a beneficiary of such trust." As we then observed, "There is, in § 267, no language to support the taxpayers' claim that a beneficiary who

has only a remote chance of sharing in trust property is not a 'beneficiary' of the trust for purposes of § 267." *Id.* at 402. Likewise, there is no language to absolve Cecelia and Jacob from being family members within the meaning of § 267(c)(4). The *Wyly* court added, "[I]t does not matter whether the transaction is bona fide, at arms length, or in good faith with no tax avoidance motive. Whatever the reason, if the proscribed relationship exists, no loss is recognized for tax purposes." *Id.* at 401.[27]

Metzger Dairies points out that both *Wyly* and *Merritt v. Commissioner,* 400 F.2d 417 (5th Cir.1968), were concerned with § 267(a) and § 267(b). A literal interpretation of §§ 267(a) and (b), it contends, does not foreclose a nonliteral interpretation of § 267(c). Nevertheless, here, as in *Wyly,* the "proscribed relationship" existed. We see no reason for interpreting § 267(c) differently from § 267(b) or § 267(a). Both § 267(b) and § 267(c) are attribution rules, in that they define the circumstances under which a shared economic interest will be presumed. Congress cannot have intended one subsection to be interpreted literally and the other flexibly. Only a strict interpretation of both provisions is logically consistent. Only such an interpretation will "relieve[] the taxing authority of many complicated and complex melioristic decisions in family transactions." *Merritt v. Commissioner,* 400 F.2d at 421.

In sum, § 267(c) provides constructive ownership rules which "shall" be applied in determining the relatedness of taxpayers. We see no reason to deviate from this express statutory command. Indeed, by our reading, the Fifth Circuit and Supreme Court precedents forbid it. Accordingly, we hold that Metzger Dairies was not enti-

---

**27.** The *Wyly* panel also quoted the following passage from *Merritt v. Commissioner,* 400 F.2d 417, 421 (5th Cir.1968):

> We do not read Section 267 as seeking out devils alone. The basic legislative command of that section is that losses incurred from family transactions are not to be taxable events. This blanket approach relieves the taxing authority of many complicated and complex melioristic decisions in family trans-

actions. Although we do not applaud harsh results (though defining the result in this case as 'harsh' would be no easy task), we recognize that simplicity can be a valid congressional rationale for banning transactions by type.

662 F.2d at 402. In *Merritt* we held that a *forced* sale between related taxpayers came within § 267. 400 F.2d at 420.

tled to the interest deductions claimed because it and Cecelia were related persons within the meaning of § 267.

## CONCLUSION

The courts of appeals have been given the authority to review Tax Court decisions at least in part because it was thought that a generalist's perspective would be helpful; that we are less likely to succumb to the arcane. Yet the avoidance of the arcane must include a recognition of the limits of tax law. It is not a task measured by the chancellor's foot. As understandable as it may be, yielding to the temptation to "do equity" in a specific tax case by looking past plain language to judicially perceived purpose will not do. We do not. We apply *Davis* in full measure, leaving *Rickey* where it was.

AFFIRMED.