AMERCO AND SUBSIDIARIES, AND REPUBLIC WESTERN
INSURANCE COMPANY, PETITIONERS *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

AMERCO AND SUBSIDIARIES, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 5100-88,        Filed January 24, 1991.
4330-89.[1]

*Michael P. Kelleher, John P. McAllister, George R. Olds,*
and *Brad S. Ostroff,* for the petitioners.
*Deborah A. Butler* and *Rebecca W. Wolfe,* for the
respondent.

KÖRNER, *Judge:* By notices of deficiency, respondent
determined the following deficiencies in petitioners' Federal
income tax:

---

[1]Consolidated for trial, briefing, and opinion.

*AMERCO & Subsidiaries—Docket Nos. 5100-88 and 4330-89*

| TYE[2] | Deficiency |
|---|---|
| 3/31/75 | $1,152,077 |
| 4/02/77 | 1,173,053 |
| 4/01/78 | 4,055,392 |
| 3/31/79 | 7,928,408 |
| 3/29/80 | 13,252,182 |
| 4/03/82 | 763,623 |
| 4/02/83 | 10,960,156 |
| 3/31/84 | 4,416,580 |
| 3/30/85 | 645,671 |

*Republic Western Insurance Co.—Docket No. 5100-88*

| TYE | Deficiency |
|---|---|
| 12/31/79 | $9,960,885 |
| 12/31/80 | 570,141 |
| 12/31/81 | 138,105 |
| 12/31/82 | 570,441 |

By an amendment to answer in docket No. 5100-88, respondent increased the deficiencies by the following amounts:

*AMERCO & Subsidiaries*

| TYE | Increased deficiency |
|---|---|
| 4/01/78 | $1,184,950 |
| 3/29/80 | 862,137 |
| 4/03/82 | 1,200,025 |

*Republic Western Insurance Co.*

| TYE | Increased deficiency |
|---|---|
| 12/31/79 | $37,242 |
| 12/31/80 | 366,102 |
| 12/31/82 | 124,696 |

The primary issue for decision is the proper characterization, for purposes of the Federal income tax, of certain transactions involving petitioners as well as other parties. Specifically, we must determine whether any, some, or all of the transactions constituted "insurance," as that term fits into the tax lexicon. Derivatively, assuming we decide the primary issue at least partially in favor of respondent, we must decide whether respondent correctly included in petitioner Republic Western Insurance Co's. 1979 income its

---

[2] A notice of deficiency slightly misstates certain dates of petitioner AMERCO and Subsidiaries' tax years. Those dates are correctly stated herein.

loss reserve balances as of the beginning of that year with regard to certain insurance coverages purchased in prior years. Finally, we will address the propriety of one of our evidentiary rulings at trial.

Although deficiencies were determined for tax years dating back to 1975, only transactions which occurred between 1979 and 1985 are at issue.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

### I. *The Players*

#### A. *AMERCO & Subsidiaries*

AMERCO, a Nevada corporation, had its principal office in Las Vegas, Nevada, when it filed its petitions in this case. Its "subsidiaries" are certain subsidiary corporations that joined AMERCO in filing consolidated Federal income tax returns for the years at issue. AMERCO wholly owned each subsidiary, either directly or through other corporations; members of the L.S. Shoen family held controlling amounts of AMERCO's stock.

AMERCO was a holding company during the years at issue: its principal function was to own its subsidiaries' stock. It had from one to three employees over this period, and owned no significant asset besides the stock.

AMERCO's subsidiaries generally comprised the U-Haul rental system.[4] U-Haul International, Inc., was the administrative clearinghouse to the system; its responsibilities included negotiating and purchasing certain insurance coverages connected with the system. Also included in the U-Haul system were: AMERCO Lease Co., owner of much of the U-Haul rental equipment; U-Haul rental companies,

---

[3] A stipulation of agreed issues in docket No. 4330-89 settled issues arising from certain depreciation deductions and prepaid advertising expenses of petitioner AMERCO & Subsidiaries. Other issues raised by respondent's determinations, but not argued, were apparently resolved by the parties. We are requiring the parties to submit Rule 155(a) computations in order to clarify the effect of the settled and resolved issues on our decisions.

[4] Sometimes also included under the U-Haul rental system rubric are individuals, partnerships, and corporations that participate in the U-Haul rental business but are not employed, controlled, or owned by AMERCO or its subsidiaries. See, e.g., part C of this section I, *infra*.

repair shops, manufacturing companies, and miscellaneous service companies; and Movers World, a full-service van line company established in 1984. In total, approximately 250 subsidiary corporations, located throughout the United States, joined AMERCO's consolidated returns for the years at issue.

B. *Republic Western Insurance Co.*

Republic Western Insurance Co. (hereinafter Republic Western), an Arizona corporation, had its principal place of business in Phoenix, Arizona, when it filed its petition in this case. It is a third-tier, wholly owned subsidiary of AMERCO. Republic Western filed its own Federal income tax returns for the years at issue; i.e., it did not participate in AMERCO & Subsidiaries' consolidated returns.

Republic Western was incorporated in 1973. It was not, however, AMERCO's (and its predecessor corporation's) initial insurance subsidiary. In the late 1950s Frontier Insurance Agency, a licensed insurance broker, was formed. Frontier represented the U-Haul companies, as well as other insureds. In 1968 Frontier was replaced by Ponderosa Insurance Agency. In 1969 Oxford Life Insurance Co. was acquired, as a wholly owned subsidiary of Ponderosa. Republic Western joined the AMERCO group as a wholly owned subsidiary of Oxford Life.

Republic Western is a property and casualty insurance company. In 1979 it was licensed in 12 States; by the end of 1985 it was licensed in 45 States and the District of Columbia. Republic Western is not licensed under any State captive insurance company statute.

The following table represents Republic Western's capital and surplus over the period at issue:

| Year | Paid-in capital | Paid-in surplus | Surplus notes | Earned surplus | Total |
|------|-----------------|-----------------|---------------|----------------|-------|
| 1979 | $2,350,000 | $1,000 | $7,425,000 | $5,690,862 | $15,466,862 |
| 1980 | 2,350,000 | 1,000 | 7,425,000 | 10,097,496 | 19,873,496 |
| 1981 | 2,350,000 | 1,000 | 7,425,000 | 15,226,545 | 25,002,545 |
| 1982 | 2,350,000 | 1,000 | 7,425,000 | 23,915,025 | 33,691,025 |
| 1983 | 2,350,000 | 10,001,000 | - - - | 32,457,462 | 44,808,462 |
| 1984 | 2,350,000 | 10,001,000 | - - - | 37,820,459 | 50,171,459 |
| 1985 | 2,350,000 | 10,001,000 | - - - | 39,431,468 | 51,782,468 |

Republic Western held A.M. Best Co. ratings of "A" (excellent) for 1980 through 1984, and "B+" (very good) for 1985. It was not eligible to be rated for 1979.[5]

Republic Western owns a subsidiary, Republic Claims Service Co. Republic Claims Service provides claims adjustment services with regard to policies insured or reinsured by Republic Western.

From 1979 through 1985 Republic Western and Republic Claims Service had the following numbers of employees:

| Year | Republic Western | Republic Claims Service |
|------|------------------|-------------------------|
| 1979 | 10 | 59 |
| 1980 | 12 | 63 |
| 1981 | 14 | 65 |
| 1982 | 19 | 87 |
| 1983 | 24 | 84 |
| 1984 | 23 | 86 |
| 1985 | 43 | 83 |

## C. *Fleet Owners*

Fleet owners own the U-Haul rental fleets. They include individuals, partnerships, and corporations. "Company fleet owners" are entities subsidiary to or affiliated with AMERCO. "Independent fleet owners" are unrelated by ownership to AMERCO; they do, however, include some individuals who are shareholders, officers, directors, and employees of AMERCO and its subsidiaries.

Independent fleet ownership was begun by Mr. L.S. Shoen in 1952. It provided a means of financing his U-Haul venture. Independent fleet owners purchased either partial or complete interests in U-Haul equipment, and then agreed to a fleet owner contract making the equipment available for rent in the U-Haul system. Pursuant to the contract, fleet owners shared in the income and expenses generated by their equipment. Equipment was titled in the U-Haul name; the fleet owner contracts listed the fleet owners as "owners."

---

[5]The A.M. Best Co. explains its rating system as follows:

The objective of Best's rating system is to evaluate the factors affecting the overall performance of an insurance company to provide our opinion of the company's relative financial strength and ability to meet its contractual obligations. The procedure includes both qualitative and quantitative reviews of the company. [A.M. Best Co., Inc., Best's Insurance Reports—Property-Casualty 1986 vii (87th Ann. Ed.).]

Most of the equipment owned by independent fleet owners was rental trailers. The following schedule represents the ownership of trailers operated in the U-Haul system:

| Year ended | Independently owned trailers | Company owned trailers |
|---|---|---|
| 3/31/79 | 74,870 | 24,870 |
| 3/29/80 | 68,000 | 24,000 |
| 3/28/81 | 63,000 | 25,000 |
| 4/03/82 | 59,000 | 30,000 |
| 4/02/83 | 57,000 | 34,000 |
| 3/31/84 | 55,000 | 38,000 |
| 3/30/85 | 53,350 | 43,650 |

Independent fleet owners also held interests in U-Haul rental recreational vehicles, beginning in 1984.

Pursuant to the fleet owner contracts, independent trailer fleet owners were required to purchase public liability and property damage insurance.[6] U-Haul International arranged for the insurance coverage, and picked the insurance carrier and limits. Fleet owners had no discretion to decline this coverage or vary its terms or carrier. They paid for the insurance via monthly deductions from their gross rental income shares.

Trailer fleet owner contracts also contained a "hold harmless" clause, which generally provided that:

UHI [U-Haul International] shall keep, save and hold harmless the [fleet] OWNER from any and all damages and liability for anything and everything whatsoever arising from the operation of said trailers in the SYSTEM, save and except the aforementioned expenses herein set out as chargeable to the OWNER.

Independent recreational vehicle fleet owners were likewise charged for insurance coverages by U-Haul International to cover their risks which arose in connection with the operation of their vehicles in the rental system.

---

[6]The definitional nature of this case heightens the significance of our use of terms such as "insurance." We therefore clarify that, as used in these findings of fact, the use of such terms is intended to convey the parties' characterization of the transactions. Whether these transactions constituted "insurance" for purposes of the Federal income tax is a question of law which we address in our opinion.

## D. *U-Haul Customers*

U-Haul customers are persons who rented U-Haul trailers, trucks, and self-storage facilities during the years at issue. A rental or storage contract was signed by all U-Haul customers.

With regard to insurance, the truck rental contract substantially provided:

> This vehicle is covered by a liability insurance policy which provides coverage to the Customer against bodily injury and property damage claims with limits of liability up to the requirements of the State Financial Responsibility Law or other applicable statute affecting rental motor vehicles in the state in which the accident may occur. This coverage shall apply as excess insurance with respect to any person or organization, his agents or his employees, if there is other valid and collectible insurance applicable to the same loss covering such person or organization as a named insured with limits at least equal to the financial responsibility requirements of the state in which the accident occurs or claim is brought. (This section shall not apply if it is contrary to any law, statute or public policy of the jurisdiction in which the accident occurs, or claim is brought.)

The truck rental contract did not separately state a charge for this minimum financial responsibility coverage; its cost was included as part of the basic rental fee. The trailer rental contract contained no analogous provision.

Both the truck and trailer rental contracts offered optional "SafeMove" insurance. SafeMove provided three coverages: (1) A collision damage waiver, which relieved the rental customer of any liability to the lessor for damaging the rental equipment; (2) cargo damage insurance; and (3) accidental death and medical coverage. A separate, additional fee was charged for the SafeMove coverages.

The U-Haul storage contract offered optional "SafeStor" insurance. SafeStor provided property damage and loss coverage. It generally protected all stored items, excepting certain goods such as jewelry, documents, and motorized vehicles. Risks covered included fire, vandalism, and building collapse. A separate, additional fee was charged for the SafeStor coverage.

## E. *Non-U-Haul Customers*

In addition to members of the AMERCO group and customers of the U-Haul system, there were a number of outside unrelated entities, who did not patronize the U-Haul system, who bought insurance from Republic Western. Such customers generated premium income for Republic Western as found separately hereinafter. The premium income from these sources is not part of the present controversy.

## II. *The Transactions*

During the years at issue Republic Western insured a wide variety of risks. For purposes of this case, that business is divisible into the following categories: (A) "U-Haul corporate policies," covering various risks of AMERCO and subsidiaries; (B) "U-Haul workers' compensation policies," covering workers' compensation liabilities of AMERCO and subsidiaries; (C) "U-Haul rental system liability policies," covering liabilities of AMERCO & Subsidiaries as well as third parties arising in connection with the operations of the U-Haul system; (D) "SafeMove and SafeStor policies," providing personal property insurance coverage for U-Haul rental customers; and (E) "Non-U-Haul policies," covering risks and parties unrelated to the U-Haul system.[7] An alternative stratification distinguishes those coverages provided AMERCO from those provided its subsidiaries and from those provided other persons and entities.

## A. *U-Haul Corporate Policies*

U-Haul corporate policies provided insurance coverages and bonds for AMERCO, its subsidiaries, affiliates, and/or the AMERCO Federal Credit Union. Insured risks included real and personal property coverages, commercial multiple

---

[7]Respondent objects to various parts of this division and categorization of Republic Western's insurance business, as well as to allocations of that business within the categories, as: (1) Not reflective of Republic Western's and/or AMERCO & Subsidiaries' books and records; (2) including arbitrarily selected policies and lines of policies; and (3) containing manipulated figures. We reject respondent's first argument as inapposite: the question is not whether petitioners maintained books and records well suited for captive insurance litigation, but whether the figures which were presented in this case were fairly and accurately prepared. We find that such preparation did take place, and accordingly reject respondent's second and third arguments as unsubstantiated. In sum, we find that petitioners carried their initial burden of going forward on these matters, and that respondent did not carry his resultant burden to persuade us otherwise. See also *infra* notes 8 and 9.

peril coverages, boiler and machinery coverages, and pollution and other liability coverages. Surety bonds covered AMERCO, its subsidiaries, affiliates, licensees, or franchisees.

Republic Western received the following gross written premiums under the U-Haul corporate policies:

| Year | Amount |
|------|--------|
| 1979 | $253,700 |
| 1980 | 554,900 |
| 1981 | 604,450 |
| 1982 | 307,444 |
| 1983 | 264,461 |
| 1984 | 1,756,496 |
| 1985 | 1,744,518 |

## B. *U-Haul Workers' Compensation Policies*

U-Haul workers' compensation policies provided workers' compensation liability coverage to AMERCO & Subsidiaries. They were issued by Insurance Company of North America from April 1979 through March 1981, and by Aetna Casualty & Surety Co. from April 1981 through March 1985. The policies were reinsured by Republic Western.

Republic Western received the following gross written premiums under the U-Haul workers' compensation policies:

| Year | Amount |
|------|--------|
| 1979 | $1,942,080 |
| 1980 | 3,471,795 |
| 1981 | 5,212,413 |
| 1982 | 4,475,155 |
| 1983 | 4,251,463 |
| 1984 | 5,749,346 |
| 1985 | 10,256,358 |

## C. *U-Haul Rental System Liability Policies*

U-Haul rental system liability policies provided third-party liability and property coverages in connection with the operation of the U-Haul rental system. These policies insured AMERCO & Subsidiaries, independent fleet owners, and U-Haul truck rental customers. Republic Western either directly wrote these policies, or reinsured them in part or in whole.

The rental system liability policies incorporated a number of coverages. They provided the public liability and prop-

erty damage coverages purchased by U-Haul International on behalf of independent fleet owners of rental trailers and recreational vehicles. They also provided the minimum financial responsibility coverages purchased by truck rental customers under the truck rental contract. These policies also insured AMERCO & Subsidiaries.

Republic Western received the following gross written premiums under the U-Haul rental system liability policies:

| Year | Amount |
|------|--------|
| 1979 | $15,418,350 |
| 1980 | 14,045,413 |
| 1981 | 15,227,664 |
| 1982 | 18,350,043 |
| 1983 | 25,463,400 |
| 1984 | 25,735,977 |
| 1985 | 30,918,190 |

These gross written premiums are divisible between insureds as follows:

| Year | Truck rental customer premium[8] | Independent fleet owner (trailer) premium[9] | Independent fleet owner (recreational vehicles) premium | AMERCO & Subsidiaries premium |
|------|------|------|------|------|
| 1979 | $6,040,000 | $1,988,967 | - - - | $7,389,383 |
| 1980 | 5,281,000 | 1,813,263 | - - - | 6,951,150 |
| 1981 | 4,576,000 | 1,681,134 | - - - | 8,970,530 |
| 1982 | 6,220,000 | 1,632,521 | - - - | 10,497,522 |
| 1983 | 11,657,000 | 1,728,285 | - - - | 12,078,115 |
| 1984 | 11,262,000 | 1,385,035 | $319,000 | 12,769,942 |
| 1985 | 9,504,000 | 1,376,476 | 3,322,000 | 16,715,714 |

---

[8]To reiterate and specifically apply our discussion in note 7, *supra*, we agree with and adopt as a fact petitioners' allocation of the cost of minimum financial responsibility coverages to its truck rental customers. We find the question of whether or not this insurance overlapped with and, as a result, satisfied any statutory responsibilities of the U-Haul rental system to procure certain coverages irrelevant to this finding. The minimum financial responsibility coverage insured risks of U-Haul truck rental customers. As a result, U-Haul International was free to collect the charge for this coverage from its customers. As stated above, we find that it did collect this charge as part of the basic rental fee (notwithstanding the fact that this charge was not separately stated in the rental contract). U-Haul truck rental customers thus paid for, were covered by, and, resultantly, were properly chargeable as insureds under the minimum financial responsibility strata of these policies.

[9]Respondent objects to this finding based on the hold harmless clause of the fleet owner contract. He argues that insurance premiums are not properly attributable to independent fleet owners because their potential liabilities had already been assumed by U-Haul International under that clause. We disagree. The fleet owner contract must be read as a whole, i.e., the hold harmless clause must be construed in conjunction with the fleet owners' obligation to purchase liability coverages. We accordingly conclude that the hold harmless clause was conditioned upon this purchase of insurance and, as a result, that the cost of this insurance is properly chargeable to the fleet owners.

## D. *SafeMove and SafeStor Policies*

SafeMove and SafeStor policies provided various coverages to U-Haul rental customers. Republic Western reinsured the SafeStor coverage, as well as the cargo portion of SafeMove.

Republic Western received the following gross written premiums under the SafeMove and SafeStor policies:

| Year | Amount |
|------|--------|
| 1979 | $1,988,096 |
| 1980 | 2,727,730 |
| 1981 | 3,773,919 |
| 1982 | 3,661,406 |
| 1983 | 4,093,066 |
| 1984 | 4,758,188 |
| 1985 | 4,804,705 |

## E. *Non-U-Haul Policies*

Non-U-Haul policies provided a wide variety of insurance and reinsurance coverages. Insureds under these policies had no relationship to AMERCO & Subsidiaries or the U-Haul rental system.

Republic Western received the following gross written premiums under the Non-U-Haul policies:

| Year | Amount |
|------|--------|
| 1979 | $1,133,432 |
| 1980 | 2,239,409 |
| 1981 | 8,123,129 |
| 1982 | 14,880,215 |
| 1983 | 25,294,248 |
| 1984 | 38,547,752 |
| 1985 | 58,979,807 |

## F. *Alternative Stratification*

Viewed from a different perspective, the policies of insurance outlined above are divisible between coverages written for AMERCO & Subsidiaries, and "other insurance." Policies written for AMERCO & Subsidiaries included the U-Haul corporate policies, U-Haul workers' compensation policies, and that part of the U-Haul rental system liability policies attributable to AMERCO & Subsidiaries. Other insurance, which covered risks of parties other than AMERCO & Subsidiaries, included the remainder of the

U-Haul rental system liability policies, SafeMove and SafeStor policies, and the Non-U-Haul policies.

The following table compares the percentage share of Republic Western's gross written premiums attributable to insurance for AMERCO & Subsidiaries with the share attributable to other insurance (as defined in this section):

| Year | AMERCO's and Subsidiaries' insurance | Other insurance |
|------|------|------|
| 1979 | 46% | 54% |
| 1980 | 48 | 52 |
| 1981 | 45 | 55 |
| 1982 | 37 | 63 |
| 1983 | 28 | 72 |
| 1984 | 26 | 74 |
| 1985 | 27 | 73 |

The policies written for AMERCO & Subsidiaries are further divisible between coverages provided AMERCO, the parent, and coverages provided subsidiaries. As stated above, AMERCO was a holding company during the years at issue, with one to three employees and no significant asset besides its subsidiaries' stock. It was not an insured company fleet owner. Based on these facts, as well as the relative sizes of AMERCO and its subsidiaries, and our finding that petitioners' witness Bruce Kiger, comptroller of U-Haul International, was both qualified and credible, we accept Mr. Kiger's testimony that insurance premiums attributable to AMERCO itself totaled $35,000 over the entire period at issue.[10]

## III. *Respondent's Determinations* [11]

In his notices of deficiency, respondent made the following determinations: (1) He disallowed insurance expense deductions claimed by AMERCO & Subsidiaries with regard to risks insured or reinsured by Republic Western; (2) he allowed AMERCO & Subsidiaries certain loss adjustment, claims adjustment, and underwriting expenses, concomitant

---

[10]Verbatim, Mr. Kiger testified that AMERCO's premiums "totaled less than $35,000 for the years [at issue] combined." We have rounded this estimate to $35,000.

[11]This section is intended to be illustrative; it does not contain an exhaustive description of respondent's determinations or the procedural background to this case. As discussed in note 6, *supra*, this section's characterizations of the transactions at issue are in no way intended as commentary on or disposition of the legal issues in this case.

to disallowing the insurance expenses; (3) he determined that Republic Western did not have income from payments received with regard to insurance and reinsurance purchased by AMERCO & Subsidiaries; (4) he disallowed deductions taken by Republic Western for losses paid in connection with insurance and reinsurance purchased by AMERCO & Subsidiaries; (5) he disallowed claims adjustment and under-writer's expenses of Republic Western, claimed with regard to insurance and reinsurance purchased by AMERCO & Subsidiaries; (6) he disallowed Republic Western's additions to loss reserves in connection with insurance and reinsur-ance purchased by AMERCO & Subsidiaries; and (7) he included in Republic Western's income for 1979 its loss reserves balances as of January 1 of that year, with regard to insurance and reinsurance purchased by AMERCO & Subsidiaries in prior years. This particular determination is explained in the notice of deficiency as follows:

These reserves balances are being returned to income in 1979, the year it is determined Amerco, Inc.,[12] did not acquire insurance from you, either directly or indirectly through a reinsurance arrangement * * * , as there is no further need to maintain the reserves since Amerco, Inc., will be writing off losses as incurred under its self-insurance program.

Underlying respondent's determinations is a basic dis-agreement with the form of petitioners' transactions. As a notice issued AMERCO & Subsidiaries states:

you have not established that insurance was purchased. This determina-tion is based on the fact insurance was not acquired in connection with the payments because risk-shifting and risk-distributing did not take place when funds were paid to your captive insurance company, Republic Western Insurance Company.

The notices' determinations encompassed all the cover-ages described above, excepting the Non-U-Haul and U-Haul Workers' Compensation Policies. By an amendment to

---

[12]U-Haul International was known as Amerco, Inc. during the period of Dec. 27, 1972-Jan. 17, 1977. It is unclear whether respondent's references to Amerco, Inc. were intended as references to U-Haul International, which purchased insurance on behalf of the U-Haul system, or to AMERCO, the parent corporation. We do not, however, imply that this inexactitude in any way rendered respondent's notice inadequate.

answer respondent expanded his determinations to include the U-Haul Workers' Compensation Policies; accordingly, he therein increased AMERCO & Subsidiaries' and Republic Western's deficiencies.

OPINION

*Issue I: The Existence of Insurance*

A. *Perspectives of the Transactions*

1. The Insurance Industry

At trial petitioners presented the oral and written testimony of Bruce W. Foudree. Mr. Foudree is an attorney with extensive background in insurance regulation. He practices in the areas of corporate and regulatory insurance law, served as Insurance Commissioner for the State of Iowa between 1980 and 1986, and was president of the National Association of Insurance Commissioners (NAIC) in 1985. Mr. Foudree was accepted by the Court as an expert in the area of State insurance regulation.

The stated purpose of Mr. Foudree's written report "is to describe how Republic Western Insurance Company is regulated and the effects of state regulation on the company and, in particular, its contracts of insurance issued to AMERCO and its affiliates." The report reaches the following conclusions:

In the eyes of regulators, insurance provided by a subsidiary or affiliated insurer to its parent or affiliate is just as much insurance as that provided by any other insurer. For state regulators, it makes no difference when an insurer incorporated and regulated under a standard state insurance law [as opposed to state captive insurance law], such as Republic Western, insures risks of its owner and other affiliates, in addition to unrelated risks. In a multitude of ways, state insurance laws treat related insureds the same as unrelated insureds. No distinction is made between related or unrelated risks and premiums in NAIC annual statement reporting, state examinations, state premium taxes, state guaranty association assessments and payments, and assigned risk pools. Significantly, when an insurer becomes insolvent and is liquidated, the state guaranty association and the court-appointed liquidator for the company will generally pay any claims by its parent or affiliates under a policy as insurance policy claims, not as shareholder claims.

Given all these facts regarding state insurance regulation, it is my opinion that state insurance regulators view all of Republic Western's

contracts with its insureds, including those with its affiliates AMERCO and subsidiaries, as valid contracts of insurance.

Mr. Foudree's report includes a review of State insurance regulation. The review supports his conclusions.

2. Insurance and Economic Theory

Respondent presented the testimony of Richard E. Stewart. Mr. Stewart is chairman of Stewart Economics, Inc., a consulting firm. He advises clients on a variety of insurance matters, has practiced law, and served as Superintendent of Insurance of New York State from 1967 through 1970. Mr. Stewart was accepted by the Court as an expert in the areas of insurance regulation and the practical functioning of the insurance business.

Mr. Stewart's report adopts a different perspective than Mr. Foudree's. It sets out to determine whether the contested transactions constitute " 'insurance' as that term is understood and used in the insurance business. * * * The question is addressed from the standpoint of AMERCO the holding company, taken by itself."

Mr. Stewart states that an essential enquiry is whether "risk transfer" occurred. As his report sets forth and then opines:

what it all comes down to is whether there is transfer of financial risk from AMERCO and its subsidiaries to Republic Western from the viewpoint of the common parent. There is not. The reason is that Republic Western is owned by AMERCO.

Whether Republic Western's business comes directly from its parent or from other AMERCO subsidiaries (e.g., local servicing companies), the effect is not to transfer risk away from AMERCO. AMERCO, the parent, is just moving the risk from one pocket to another. Whether the movement immediately makes a particular subsidiary richer or poorer, the effect at the AMERCO level is as though nothing has happened.

\* \* \* \* \* \* \*

It makes no difference that Republic Western accepts risks from unrelated third parties, such as cargo risks from rental customers. AMERCO's own risks are in no way changed or shifted by Republic Western's accepting unrelated risks. All that happens is that Republic Western's total exposure to loss is increased by the unrelated business. [Fn. ref. omitted.]

Instead, Mr. Stewart concludes, the transactions at issue can best be understood according to "the prevailing view in

and around the insurance business that a wholly owned insurance company is just another device for the risk retention aspects of a risk management program."

Cross-examination emphasized the fact that Mr. Stewart wrote his report from AMERCO's perspective. When questioned about how analogous transactions would be viewed by other parties, Mr. Stewart indicated that his analysis would differ and his conclusions might change.

Both petitioners and respondent presented expert testimony which addressed the transactions at issue on an academic, theoretical level. Petitioners presented the testimony of Professors J. David Cummins and Neil A. Doherty, both of The Wharton School at University of Pennsylvania. Professors Cummins and Doherty are accomplished, recognized insurance experts, conversant in the theory and practice of insurance.

Both petitioners' witnesses offered definitions of "insurance." Professor Cummins's report states:

Insurance exists when the following elements are present: (1) Economically independent decision makers who enter into contracts to reduce the economic consequences of pure risk;[13] (2) the transfer of risk to an insurance pool that reduces uncertainty through the operation of the law of large numbers; [14] and (3) equity capital committed to the pool to smooth out the consequences of adverse loss fluctuations.

Professor Doherty defines insurance as: "An arrangement whereby individuals or firms transfer their exposures to loss, and premiums, into a common pool. Losses suffered by the individual participants are paid from the common resources of the pool."

Central to both professors' definitions is the pooling aspect of insurance. Insureds transfer their risks to a pool, thereby reducing their exposures to pure risk. Both also

---

[13]Professor Cummins defines "pure risk" as:

one in which the event can produce either a loss or no loss, i.e., there is no possibility of profit. In contrast, speculative risks can produce either a profit or a loss. Examples of pure risks are exposure to fires, windstorms, motor vehicle accidents, and liability lawsuits. Speculative risks are created when one purchases securities or enters into a business venture. [Emphasis in original removed.]

[14]Professor Cummins describes the "operation of the law of large numbers" in insurance pooling as follows: "As the size of the pool increases, the chance that the loss per policy during any given period will deviate from the expected loss by a given amount (or proportion) declines."

agree that some presence of mutually independent parties is necessary to the existence of insurance. As Professor Cummins states:

> If no outside risks were present in the Republic Western pool, the arrangement would be a self insurance plan and would not constitute true insurance. No real change in the risk characteristics of Amerco would have been accomplished by merely setting up a self insurance plan, regardless of its degree of formality. It is the mutual agreement between Amerco and the outside entities to pool their risks than [sic] makes the arrangement insurance.

Both professors' reports apply their criteria for insurance to the transactions at issue, and conclude that the transactions were insurance.

Respondent presented the testimony of Dr. Irving H. Plotkin. Dr. Plotkin is a vice president of Arthur D. Little, Inc. He is expert in a number of fields, including the theory and practice of insurance. Dr. Plotkin has previously testified before this and other courts on captive insurance matters.

Dr. Plotkin perceives insurance and, deductively, the transactions at issue, very differently than Professors Cummins and Doherty. As his report summarizes:

> Commercial insurance is a mechanism for transferring (or shifting) the financial uncertainty arising from specific pure risks faced by one firm[15] to another firm in exchange for an insurance premium. * * * A firm (e.g., AMERCO) that places its risks, either directly or through a fronting company, in an insurance company that it directly or indirectly owns (e.g., RW [Republic Western]), is not relieving itself of this financial uncertainty. The reason is simply that, through its ownership position, the firm still holds the benefits and burdens of retaining the financial consequences of its own risks. It has a dollar-for-dollar economic interest in the result (the actual loss experience) of any "insured" peril. This remains the case no matter how much unrelated business the captive may write. [Fn. renumbered, relocated, and condensed.]

Thus, focusing on AMERCO's equity ownership of Republic Western, Dr. Plotkin concludes that "the transactions between AMERCO and RW [Republic Western] cannot be considered 'insurance' from the standpoint of the insurance

---

[15]Dr. Plotkin defines a "firm" as "a collection of economic assets under common control. It stands for the aggregate of the several legal entities in which these assets may be held."

and economic professions."[16] It is thus Dr. Plotkin's view that, to have true insurance, another financially unrelated party must assume the risk of the insured. He maintains this position despite his admission that, in the case of a mutual insurance company, where policyholders are the owners of the company, true insurance can exist.

Central to Dr. Plotkin's whole approach to the problem presented herein is the concept, which recurs through his testimony, of the "firm" or the "economic family." In the context of the present case, these terms have the same meaning. They mean that from the standpoint of the economist, a corporation and its subsidiaries and affiliates are all considered as one economic unit, and are to be treated as such, without giving any recognition to the fact that the parent and subsidiaries may be viable and substantial organizations, each conducting active business enterprises, and dealing with the outside world as well as with members of their own group.

### 3. Financial Accounting

Respondent presented the testimony of Dr. James E. Wheeler, professor of accounting at the Graduate School of Business Administration of the University of Michigan. Dr. Wheeler was accepted by the Court as an expert in the field of financial accounting.

Dr. Wheeler testified about generally accepted accounting principles (GAAP). He stated that under GAAP no expense for insurance for financial reporting purposes is allowed for insurance premiums paid to a wholly owned subsidiary or between wholly owned brother-sister corporations. He also stated that this rule of nonrecognition applied regardless of any unrelated-party insurance that the insurance subsidiary might write.

On brief, petitioners criticize Dr. Wheeler's testimony as inapposite. They argue that GAAP principles, which require related corporate entities to be treated as a single enterprise

---

[16]Professor Cummins's report comments as follows on an insured's ownership of its insurer:

The ownership of equity by a single major policyholder does not negate risk transfer and risk reduction through pooling unless the correlations between the losses of the outside and inside risks are extremely high. Such high correlations are rare in practice and would prevent insurance from operating regardless of the organizational form of the insurer.

Professor Cummins found no such correlations in the transactions at issue.

in all types of intercorporate transactions, are simply irrelevant to the tax law considerations before this Court. We agree. It is clear that the Federal income tax does frequently perceive related corporate entities as separate enterprises and taxpayers. See, e.g., sec. 1.1502-13(b), Income Tax Regs. (gain or loss on nondeferred intercompany transactions taken into account on consolidated returns); sec. 482, I.R.C. 1986 (recognizing and regulating transactions between commonly controlled taxpayers); *George E. Warren Corp. v. United States*, 135 Ct. Cl. 305, 141 F. Supp. 935, 939 (1956) (bad debt deduction allowed on partially worthless debt between commonly owned corporations).

## B. *Precedential Framework*

Having reviewed the facts of this case, and after due consideration of the applicable case law in this area, we conclude that no precedential authority exists which binds and specifically controls our opinion on this matter. While both this Court and the Ninth Circuit, the circuit where this case may be appealed,[17] have considered "captive insurance" issues, we simply find the present case factually distinguishable. Two factors most prominently make this point: who Republic Western insured, and how it was licensed and regulated.

1. Republic Western's Insurance Business: Republic Western's insurance business was diverse. It insured a wide variety of risks, both for AMERCO & Subsidiaries and for other, unrelated parties. The coverages written under the SafeMove and SafeStor policies, the Non-U-Haul policies, and the portions of the U-Haul rental system liability policies attributable to truck rental customers and independent fleet owners all insured risks of parties unrelated to AMERCO. As found above, this outside insurance[18] consti-

---

[17]This Court has adopted a rule that "better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971) (fn. refs. omitted). Significant factual distinctions, however, render a decision not "squarely in point." See, e.g., *David Metzger Trust v. Commissioner*, 76 T.C. 42, 72-74 (1981), affd. 693 F.2d 459 (5th Cir. 1982).

[18]While we recognize that portions of Republic Western's outside business were related to the U-Haul rental business, we point out that this fact in no way detracted from the separateness of the outside insureds or their individual interests at risk.

tuted over 50 percent of Republic Western's gross written premiums for each of the years at issue. However opaque the term "substantial" may be, it is clear that Republic Western had substantial outside, i.e., unrelated, business during each of these years.

This fact distinguishes the present case from existing authority. In *Carnation Co. v. Commissioner,* 640 F.2d 1010 (9th Cir. 1981), affg. 71 T.C. 400 (1978), the wholly owned insurer subsidiary wrote insurance only for the parent and its subsidiaries. Similarly, in *Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297 (9th Cir. 1987), affg. 84 T.C. 948 (1985), and in *Humana Inc. v. Commissioner,* 88 T.C. 197 (1987), affd. in part and revd. in part 881 F.2d 247 (6th Cir. 1989), no outside insurance was written. In *Gulf Oil Corp. v. Commissioner,* 89 T.C. 1010 (1987), affd. as to this issue, revd. and remanded 914 F.2d 396 (3d Cir. 1990), no unrelated party insurance was written during the first year at issue; 2 percent was written in the second. We are thus faced for the first time with a case of a wholly owned insurer which writes substantial—indeed, a majority—of its business in outside insurance, in addition to insuring the risks of its affiliates.

2. Republic Western's Status: Republic Western was licensed and regulated under standard State insurance laws. In 1979 it was licensed in 12 States; by the end of 1985 it was licensed in 45 States and the District of Columbia.

This status also sets this case apart from existing authority. In *Carnation* and *Gulf Oil* the insurers were Bermuda corporations. In *Clougherty* and *Humana Inc.* the insurers were licensed under State captive insurance laws. Republic Western was neither a Bermuda corporation, nor a creature of State captive insurance laws.

3. Other Factors: Other aspects of the transactions at issue are analyzed below. We find that the totality of circumstances of this case combine to create a case of first impression before this Court.

C. Discussion

We begin our discussion with the genesis of the law in this area, *Helvering v. LeGierse,* 312 U.S. 531 (1941). It must be noted that *LeGierse* was not a captive insurance

case; it rather construed and applied the phrase "receivable as insurance" within the meaning of section 302(g) of the Revenue Act of 1926, an estate tax exclusion for life insurance proceeds. *Helvering v. LeGierse,* 312 U.S. at 537-538. Its insights are important, however, because it addressed a statutory void which persists today: the lack of any statutory definition of the term "insurance." *Helvering v. LeGierse,* 312 U.S. at 538.

We find the following excerpts from *LeGierse* particularly telling:

> ▇ We think the fair import of subsection (g) is that the amounts must be received as the result of a transaction which involved an actual "insurance risk" at the time the transaction was executed. [2] Historically and commonly insurance involves risk-shifting and risk-distributing. * * * That these elements of risk-shifting and risk-distributing are essential to a life insurance contract is agreed by courts and commentators. * * *
>
> ▇ Analysis of the apparent purpose of the partial exemption granted in § 302(g) strengthens the assumption that Congress used the word "insurance" in its commonly accepted sense. * * *
>
> [*Helvering v. LeGierse,* 312 U.S. at 539-540; citations omitted.]

Three basic points are made above: (1) That an insurance transaction must involve "insurance risk;" (2) that insurance involves risk-shifting and risk-distributing; and (3) that, in the absence of a statutory definition, "insurance" is to be defined in its commonly accepted sense. We supplement these insights with another tenet, basic to all our decisions: that matters of Federal income taxation must be resolved with principles of Federal income taxation borne in mind.

These four principles do not yield a definition of insurance. They do, however, create what we believe is the proper framework to be adopted when addressing a question of the existence of insurance for Federal tax purposes. They are not independent or exclusive. Instead, we read them as informing each other and, to the extent not fully consistent, confining each other's potential excesses.

1. Presence of Insurance Risk: Basic to any insurance transaction must be risk. An insured faces some hazard; an insurer accepts a premium and agrees to perform some act if or when the loss event occurs. If no risk exists, then

insurance cannot be present. "Insurance risk" is required; investment risk is insufficient. If parties structure an apparent insurance transaction so as to effectively eliminate the effect of insurance risk therein, insurance cannot be present.

*Helvering v. LeGierse, supra*, illustrates these points. In *LeGierse* an 80-year-old woman purchased an annuity contract and single premium life insurance policy from an insurance company. The company would not have issued the insurance policy without the annuity. The aggregate premium paid was $27,125. The insurance policy's death benefit was $25,000; the annuity paid $590 a year for life. The Supreme Court analyzed the two policies together and concluded that "the contracts wholly fail to spell out any element of insurance risk." The Court found that the two contracts counteracted each other's risk, as it explained: "annuity and insurance are opposites; in this combination the one neutralizes the risk customarily inherent in the other. From the company's viewpoint, insurance looks to longevity, annuity to transiency." *Helvering v. LeGierse*, 312 U.S. at 541. (Citations omitted.) As a result, the only risk effectively present in the transaction "was an investment risk similar to the risk assumed by a bank; it was not an insurance risk." Since the Court found an absence of insurance risk in the transaction, no exclusion for "insurance" was allowed under the applicable Code section. *Helvering v. LeGierse*, 312 U.S. at 542. See also *Carnation Co. v. Commissioner*, 71 T.C. at 409 (insurance treatment disallowed when interdependent agreements considered together found to be "void of insurance risk").

Turning to the policies presently at issue, each of the insureds faced some potential hazard. These risks were insurance, not investment risks. Also, no additional agreements counteracted the risks present in these policies. While the presence of insurance risk does not suffice to create insurance, it is a necessary component. We find that component present in all the transactions at issue in this case.

2. Risk-shifting and Risk-distributing: The Supreme Court did not define its terms "risk-shifting" and "risk-distributing" in *LeGierse*. A Tenth Circuit opinion supplies

the following terse definitions: " 'Risk-shifting' means one party shifts his risk of loss to another, and 'risk-distributing' means that the party assuming the risk distributes his potential liability, in part, among others." *Beech Aircraft Corp. v. United States,* 797 F.2d 920, 922 (10th Cir. 1986). This Court has repeatedly held that risk-shifting (sometimes also referred to as "risk transfer") and risk-distributing are necessary to the existence of insurance. *Gulf Oil Corp. v. Commissioner,* 89 T.C. at 1023.

(a) *Risk-shifting:* Our risk-shifting analysis considers all the facts and circumstances of a case, including the substance of the transactions at issue. As two excerpts from our opinions make clear:

The test [for insurance] continues to be whether, considering all of the facts, the risk of loss was shifted away from the taxpayer who seeks to deduct insurance premiums. [*Clougherty Packing Co. v. Commissioner,* 84 T.C. at 957.]

Although technically, transfer of risk may occur when a captive is involved that is a separate, viable entity, financially capable of meeting its obligations, we simply decline to recognize it as such when the arrangement is merely, in substance, the equivalent of a reserve for losses or self-insurance. [*Gulf Oil Corp. v. Commissioner,* 89 T.C. at 1024.]

Having considered the facts and circumstances of this case, the precedents before us, the expert testimony presented, and bearing in mind our other principles for deciding cases in this area, we hold that risk-shifting occurred, both technically and in substance, in all the transactions at issue.

That there was technical risk-shifting is apparent from the face of the transactions. Insurance contracts were written, premiums transferred, and losses paid. Republic Western was, to mirror our language in *Gulf Oil,* a separate, viable entity, financially capable of meeting its obligations.

Republic Western's separateness from AMERCO cannot be questioned: it was incorporated under the laws of Arizona, carried on the business of insurance, and was neither a sham nor unreal. See *Moline Properties v. Commissioner,* 319 U.S. 436, 438-439 (1943). Its viability and financial health are attested to by its A.M. Best ratings, as well as by its continued permission to operate as a fully licensed

property and casualty insurance company under the many State insurance laws and regulations. In sum, all the technical indicia of risk-shifting were present in the transactions at issue: they were written like insurance, regulated as insurance, and involved separate, viable parties.

Risk-shifting was also present in substance: Republic Western was not the equivalent of a reserve for losses of AMERCO. In fact, insurance written for AMERCO itself totaled less than 1 percent of the transactions at issue. Republic Western wrote substantial other business during each of the years at issue, see *Gulf Oil Corp. v. Commissioner,* 89 T.C. at 1027, including insurance for subsidiaries related to Republic Western as brother-sisters, see the Sixth Circuit opinion in *Humana Inc. v. Commissioner, supra,* and can simply in no way be called an "incorporated pocketbook." Having considered the entire record of this case, we conclude that the transactions' substance matched their form, and that risk-shifting occurred between Republic Western and all of its insureds.

(b) *Risk-distributing:* The concept of risk-distributing emphasizes the pooling aspect of insurance: that it is the nature of an insurance contract to be part of a larger collection of coverages, combined to distribute risk between insureds. Risk distribution was clearly present in the transactions at issue: Republic Western's insurance business was diverse, multifaceted, and, as stated, involved a substantial amount of outside risks. More of the money in its pool came from outside unrelated insureds than came from AMERCO & Subsidiaries.

To hold otherwise in this case—that the separate and viable existence of the members of the AMERCO corporate family is to be ignored, and that they are all to be considered as one "economic family" or "firm"—runs counter to basic principles of Federal income taxation. The "economic family" approach to this question has been uniformly rejected by this Court. See *Gulf Oil Corp. v. Commissioner, supra; Humana Inc. v. Commissioner, supra; Clougherty Packing Co. v. Commissioner, supra; Carnation Co. v. Commissioner, supra.*[19]

---

[19]Recent scholarly articles have likewise criticized respondent's economic family approach. See, e.g., Singer, "When the Internal Revenue Service Abuses the System: Captive Insurance

3. Commonly Accepted Notions of Insurance: We think that the technical indicia of insurance discussed above, supplemented by our analysis of the substance of the transactions at issue, combine to create insurance in the commonly accepted sense. Under this rubric we emphasize the State regulators' definitions of Republic Western as a fully licensed property and casualty insurer, and of the transactions at issue as insurance. While these definitions are not dispositive of the issue before us, they do inform our decision. We note that Congress has delegated to the States the exclusive authority (subject to exception) to regulate the business of insurance. McCarran-Ferguson Act, 59 Stat. 33, as amended, 15 U.S.C. secs. 1011-1015 (1988).

4. General Principles of Federal Income Taxation: Our consideration of this case is consistent with the principles which underlie our law of Federal income taxation. They include: a general respect for the separate identity of corporate entities, see, e.g., *Moline Properties v. Commissioner*, 319 U.S. 436 (1943); a consideration of both the substance and form of a transaction, see, e.g., *Gregory v. Helvering*, 293 U.S. 465 (1935); closely examining related-party transactions, see, e.g., *Midland Ford Tractor Co. v. Commissioner*, 277 F.2d 111, 114 (8th Cir. 1960), affg. a Memorandum Opinion of this Court; and recognizing and respecting "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits." *Gregory v. Helvering*, 293 U.S. at 469. In this regard we point out, based on the record before us, that all the premiums at issue were reasonable in amount, i.e., that the transactions were conducted in an arm's-length manner.

## D. *Holding*

We find that "insurance," for purposes of the Federal income tax, occurred in all the transactions at issue. It follows that premiums were properly reported as income by Republic Western, and insurance expenses properly deducted by the company which bore them.

---

Companies and the Delusion of the Economic Family," 10 Va. Tax Rev. 113, 163 (1990) (calling the economic family theory a "doctrinal aberration").

## *Issue II: Republic Western's Loss Reserve Balance*

Having decided Issue I in favor of petitioners, we need not reach the specific merits of respondent's inclusion in Republic Western's income its 1979 loss reserve balances for coverages sold in previous years. That determination was premised upon a disregard for the insurance form of the transactions. Since we have determined that such form should be respected, petitioner Republic Western must necessarily prevail on this derivative item and it is unnecessary for us to comment further on this issue.

## *Issue III: Our Evidentiary Ruling at Trial*

On brief, respondent requests that we reexamine one of our evidentiary rulings at trial. At issue is our granting of petitioner's motion to compel stipulation pursuant to Rule 91(f), Tax Court Rules of Practice and Procedure. The stipulated documents and facts relate to a settlement between respondent and Republic Western of Republic Western's tax liability for 1976-78. Respondent contests this ruling, claiming that the evidence was both irrelevant and inadmissible. Petitioners disagree, claiming that the previously settled tax years are directly relevant to the loss reserve balance issue, and, accordingly, that the Court ruled correctly on the motion.

Having reexamined our contested evidentiary ruling, we affirm its correctness. While we note that our conclusions in this case would not change if the documents and facts were excluded, we hold that the deemed stipulations should remain in the record. Their facts are uncontroverted, relevant, and barred by no evidentiary rule.

No genuine dispute exists as to the veracity of these facts, nor have we found any reason to question their validity. See Rule 91(f)(4). Respondent's objections focus on the relevancy and admissibility of the contested evidence.

The facts and documents are relevant to this case. Had we decided Issue I, at least in part, for respondent, and, as a result, reached the merits of Issue II, then the evidence would have been directly relevant to petitioners' argument that the proposed inclusion of Republic Western's loss reserves impermissibly reversed its settlement with respon-

dent of the 1976-78 tax years. Such an enquiry is not, as respondent attempts to argue, an attempt to "go behind" his notices of deficiency to examine the propriety of his motives for making his determinations. Compare *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. 324 (1974).

The facts and documents are also admissible. All relevant evidence is admissible unless otherwise excluded. Fed. R. Evid. 402. No rule exists to exclude this evidence. Respondent cites Federal Rule of Evidence 408, but that rule is not pertinent. Federal Rule of Evidence 408 bars the admission of evidence of compromise "to prove liability for or invalidity of the claim or its amount." Here the evidence was offered for another purpose: to inform the Court of a settlement so that we could assess its relevance to the pending controversy, and whether respondent had violated that agreement. Federal Rule of Evidence 408 was thus not violated. Nor have we found or has respondent brought to our attention any other rule which bars the admission of these facts and documents. We therefore hold that we properly granted petitioners' motion for deemed stipulations pursuant to Rule 91(f).

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

NIMS, SHIELDS, HAMBLEN, COHEN, SWIFT, JACOBS, GERBER, WRIGHT, PARR, COLVIN, and HALPERN, *JJ.,* agree with the majority.

WELLS and RUWE, *JJ.,* did not participate in the consideration of this opinion.

––––––––––

WHALEN, *J.,* dissenting: I respectfully dissent from the majority opinion in this case for the reasons stated in the "payments to insurance company subsidiary" segment of my dissenting opinion in *Sears, Roebuck & Co. and Affili-*

*ated Corps. v. Commissioner,* 96 T.C. 61 (1991), docket No. 2165-89, released today.

CHABOT and PARKER, *JJ.,* agree with this dissent.